## Allen v. Scruggs, et al.

*Petition to Establish and Probate Lost Will.*

(Decided November 7, 1914.   Rehearing denied December 17, 1914.
67 South. 301.)

1. *Courts; Jurisdiction; Organization; Record.*—Probate courts are continually open for the probate of wills, and where the transcript shows that on all occasions when the court was called upon to act or in fact did act, the presiding judge was present, the jurisdiction of this court of an appeal from an order of the probate court denying probate of a will cannot be questioned on the ground that the transcript failed to show that there was a sufficient organization of such probate court.

2. *Wills; Lost Wills; Probate; Burden of Proof.*—While a lost will may be probated, the proponent has the burden of establishing the substantial parts of said will by clear, full and satisfactory evidence.

3. *Same.*—Proof of the substance of a lost instrument as a will is sufficient, and the exact words need not be shown.

4. *Same.*—Before a lost instrument can be admitted to probate as a will it must be established that the will was signed by the testator and attested as required by section 6172, Code 1907.

5. *Appeal and Error; Review; Order Denying Probate of Will.*—While under the provision of section 5361, Code 1907, a decree of the probate court entered without the intervention of a jury, denying the admission of a lost will to probate is without presumption as to correctness, yet it will not be overturned on appeal unless it is so manifestly against the evidence that a trial judge would have set aside a verdict of the jury on the same testimony.

6. *Wills; Probate; Execution.*—While an instrument is not valid as a will unless subscribed by two witnesses, its execution may be proved by testimony furnished by others than the subscribers.

7. *Same.*—The evidence examined and held to show that the alleged lost will was executed by the testator and attested by two witnesses as required by section 6172, Code 1907.

8. *Same.*—A verbal variance between an instrument alleged to be a lost will, as set out in a petition for its probate, and the proof of its contents will not preclude probate, where the substance is the same.

9. *Same.*—The evidence examined and held to establish the contents of a lost will, and to show that the testator intended to devise and bequeath all his property to certain natural children.

10. *Same.*—The evidence examined and held to show that a will delivered to one of the beneficiaries was lost by one with whom the beneficiary left it for safekeeping.

11. *Same; Presumption.*—Where a will remains in possession of the testator and is not found at the time of his death, there is a presumption that he destroyed it animo revocandi.

12. *Same; Revocation; Nature of Act.*—Revocation is an act of the mind which must be demonstrated by some visible sign or action as set out in section 6174, Code 1907.

13. *Same.*—Where a testator delivered a will to one of the beneficiaries for safekeeping, and the will was lost, the contestant has the burden to prove that it was destroyed animo revocandi.

14. *Same.*—Declarations by a testator, made subsequent to the execution of a will, that he had revoked it, are not admissible to prove revocation.

APPEAL from Choctaw Probate Court.

Heard before Hon. W. H. LINDSEY.

Petition by Robert Allen to establish and probate a lost will, with contest by Joe Scruggs and others. From a decree denying probate to the will, petitioner appeals. Reversed, rendered, and remanded.

The amended will sought to be probated is as follows: Know all men by these presents that I, L. Ryal Noble, of the county of Choctaw and state of Alabama, being of sound mind and disposing memory, but in bad health, and mindful of the uncertainty of life, do make, publish and declare this writing as my last will and testament as follows: I give and devise to my children, Duff, Lucy, Joe, Robert and Alma Allen, including Berry Allen, whose whereabouts is unknown at present, but when found, to share equally with the others, all my lands in Clarke county, Alabama, known as the McCar-

ty place, and all my lands in Choctaw county, Alabama; also all my personal property to be equally divided among my aforesaid named children, this will not go into effect until my death.

The will was witnessed by two witnesses, and acknowledged before O. H. Watson, a justice of the peace.

G. E. McGowan, R. P. Roach, and F. M. Bromberg, for appellant.

W. A. Gunter, for appellee.

McCLELLAN, J.—This is an appeal from a decree of the probate court of Choctaw county denying, upon contest, probate to any alleged lost last will and testament of L. Ryal Noble, deceased. A copy of the instrument sought to be probated was exhibited with the petition, and the copy thus exhibited was so amended by the permission of the court during the trial, as to conform it to the proponent's assertion of the contents of the alleged lost instrument. As amended, the exhibited copy will be set out in the report of the appeal. The contest was heard and decided by the probate judge, without the intervention of a jury. In his opinion the judge said: "It appearing to the satisfaction of the court, by the testimony of the witnesses examined in open court, that in the month of July, 1900, in said state and county, the said decedent did sign his name to an instrument in writing purporting to be his last will and testament, but the court is not satisfied from the evidence that the copy of the purported will filed with the petition in this case is a substantial copy of the said instrument in writing, and the judgment of the court is against the validity of the alleged will, as shown by said petition."

[Allen v. Scruggs, et al.]

The issues controlling the result of the trial (contest) were these: Whether Noble duly, legally executed his last will and testament in July, 1900. Whether the paper proposed, as stated, for probate, was a reproduction of the substantial *parts* of the instrument so executed by Noble, if so he did. If both these questions are answered in the affirmative, then whether the instrument was subsequently revoked by Noble. The evidence makes no possible case of fraud or undue influence or of unsoundness of mind in the procurement or execution of the instrument, if it was executed as proponent asserts. One or two witnesses do quote Noble as saying he did not remember signing the instrument in July, 1900; but this was wholly insufficient, under the entire evidence presented to the trial court, to create any doubt of his mental capacity to make a will at the time it is asserted by proponent he did so. As appears, the issues are few and simple, though a vast volume of testimony was offered as bearing upon their correct solution. The retention in mind of the few simple issues involved necessarily contributes to simplify the determination of the cause.

(1) A preliminary matter presented will be first considered. It is urged for appellee that this court is without jurisdiction, for that there is no sufficient *organization* of the probate court, pronouncing the decree, shown in the transcript. For such purpose the probate courts are continually open for the exercise of the powers here involved. The transcript affirmatively shows the presence of the presiding judge of the court, Judge Lindsey, on all occasions when the court was called upon to act or in fact acted. The certificate of the judge of probate recites that the transcript is true as to the *records* of the probate court of Choctaw county, in this pro-

42—190

ceeding. The insistence that this court is without jurisdiction on the transcript presented is without merit.

(2) While a lost will, duly executed, may of course be probated, the absence of the instrument places upon the proponent the burden of establishing its substantial parts by clear, full, and satisfactory evidence.—*Skeggs v. Horton,* 82 Ala. 352, 2 South. 110; *Potts v. Coleman,* 86 Ala. 94, 100, 5 South. 780.

In *Elyton Land Co. v. Denny,* 108 Ala. 553, 562, 18 South. 561—an expression that has been repeated in *Whitten v. McFall,* 122 Ala. 619, 26 South. 131—it was said, in respect of the degree of proof requisite to establish a lost will or deed, that "the proof of the contents * * * ought to be such as to leave no reasonable doubt as to" its substantial parts.

Reference to *Potts v. Coleman* will disclose that the writer in *Denny's Case* mistook the quotation from Judge Marshall, made in *Potts v. Coleman,* as stating the rule this court intended to announce, whereas in *Potts v. Coleman* this court, immediately after quoting Judge Marshall, said: "We should say, in civil cases, the proof ought to be such as to furnish satisfactory evidence of its substantial parts.—*Shorter v. Sheppard,* 33 Ala. 648."

In *Skeggs v. Horton, supra,* this court, Chief Justice Stone writing, justified the refusal of a written charge, requested by the contestants, which exacted, as does the statement quoted from *Denny's Case, supra,* a degree of proof equivalent to that required as a condition to the conviction of one accused in a criminal prosecution. The court said: "The rule invoked was too strict. * * * —*Apperson v. Cottrell,* 3 Port. (Ala.) 51 [29 Am. Dec. 239]."

*Shorter v. Sheppard,* 33 Ala. 653, 654, declared that the degree of proof requisite to establish the contents

of a lost instrument was that it (proof) "should be clear and satisfactory, and such as to secure, as far as possible, the safety designed to be given by the written evidence." It does not appear that this court intended in *Denny's Case, supra,* while also stating the theretofore accepted rule, to depart from the rule established in *Shorter v. Sheppard, Skeggs, v. Horton,* and *Potts v. Coleman* cited above; but, on the contrary, the conclusion is that the statement of a different, more exacting rule in *Denny's Case* was an inadvertence; and it, and its successor in 122 Ala. 619, 26 South. 131, must be taken as so explained.

(3) In proving, to sufficiency, the contents of a lost instrument, it is not necessary to prove the words of the instrument; proof of the substance of the contents is all that is required.—*Potts v. Coleman, supra; Laster v. Blackwell,* 128 Ala. 143, 147, 30 South. 663.

(4) Of course, an essential to the availing, or the establishment, of a lost deed or will, is that the instrument in question should have been, and, in consequence, is shown to have been, executed as the law requires as to instruments of the character here under inquiry, that it was "signed by the testator or some person in his presence, and by his direction, and attested by at least two witnesses, who must subscribe their names thereto in the presence of the testator."—Code, § 6172.

(5) The trial on this contest of the probate of the asserted lost will and testament of L. Ryal Noble, deceased, being by the judge of probate, without a jury, and the evidence being almost entirely ore tenus, the review here of his conclusion on the facts is without presumption of its correctness (Code, § 5361); but it cannot be overturned "unless it is so manifestly against the evidence that a judge at nisi prius would set aside the verdict of a jury rendered on the same testimony."

*Briel v. Exchange Bank,* 180 Ala. 576, 61 South. 277.

L. Ryal Noble was a white man, coming from an entirely respectable family of people. Soon after the War between the States, he began a meretricious association with Kit Allen, a negro woman. The woman lived on Noble's plantation, and during many, many years he had his residence in a building near by that occupied by her. He was once married to one of his race; but his wife appears to have left him. Whether her departure was because of his unlawful conduct or relation with the negro woman, Kit Allen, is not certainly shown. Some say the wife is dead; others that she still lives. They had not lived as husband and wife for a great many years. Of Noble's cohabitation with Kit Allen five children (those named in the proposed will) were born. His fatherhood of them was generally known in that section. The children took the mother's surname; but two of them were entered by him in a school for negroes at Selma, Ala., under the surname of Noble. To the rearing of all these children Noble at least contributed to their support up to maturity; they living with the mother on his plantation as stated. He paid their medical bills, and satisfied demands arising out of misconduct of the boys. The mother was during many years, if not at all times, Noble's cook; he taking his meals in her nearby abode. It is not to be doubted, as upon the whole evidence, that Noble's reprehensible manner of life, boldly maintained and sustained, effected to at least raise about him, as was natural, a degree of ostracism from those with whom he was related by ties of blood. While some or all of his kin may have visited with him and he with them, it does not appear from the evidence that the natural social result of his manner of life was absent in his case. Doubtless he realized his voluntarily established

immoral status, and to a degree, at least, withdrew, as it were, from that social association and relation normally to be expected and observed between kindred and friends.

In July, 1900, Noble became seriously ill. In preparation for the end, which he then anticipated, he undertook the making of his will. What took place on this occasion, at that time, must determine the issue of valid execution vel non of a will. In brief for appellees, the contestants' theory is thus stated: "Our theory is, and we think the court's theory was: That an undoubted attempt to write a will in July, 1900, during the night Noble was expected to die—that this will was the first and impromptu and sudden attempt of an ignorant country justice of the peace to write a will. That he wrote it and that it was signed and acknowledged as a deed before the justice, who put his certificate of acknowledgment on it, and that he put it away in Noble's trunk and gave him the key. That afterwards he must have destroyed it, as he said he had done, since it was not found, nor was it shown to have been in existence at his death in 1911 by direct or circumstantial evidence. That, if not revoked by destruction by the testator, it was not duly witnessed as a will by two witnesses."

This assertion of theory of and for the contestants, by their eminent counsel, Mr. Gunter, not only concisely presents the contentions for conclusions of fact upon which contestants rely and urged below and rely and now urge here, but also serves to afford, by deliberate acceptance, an important fact underlying and involved in the issue of "will or no will." So, on the facts in the record, and as conceded by counsel in brief, we enter upon the consideration of the first and major inquiries with the concession, as of facts, that in July,

1900, under circumstances of grave illness, Noble undertook to make a will; that in pursuit of this purpose he brought into his service (sent for) O. H. Watson, a justice of the peace; that a writing, intended to be testamentary in character, was prepared by the justice of the peace; and that this writing was "signed" by Noble, and a formal certificate of acknowledgment, as for a deed, was made on the paper by the justice and the acknowledgment taken on that occasion. It is hence to be accepted as established that Noble had a then present purpose to make a will, made a practical effort to make a will, and created a paper, expressing a testamentary purpose and intent. Aside from the issue of proof vel non of the *substance* of the instrument and of revocation vel non, if a will was duly executed, this established status of fact narrows the issue, in this connection, to this injuiry: Was the paper attested by two witnesses, in accordance with the provisions of the statute?—Code, § 6172.

( 6, 7) The evidence that bears on this inquiry has been most carefully considered and reviewed. The importance of the correct solution thereof, in affecting the conclusion in this court, will justify a discussion of such evidence in this opinion.

The evidence conclusively shows that O. H. Watson, the justice of the peace, was present on the occasion in question; that he was sent for by Noble; that upon his arrival he was told by Noble what he (Noble) wanted done; and that he (Watson) set about the performance of Noble's desire, completing a paper which was read over to Noble and signed by Noble and a certificate of Noble's acknowledgment made on the paper. The *undisputed* evidence further shows that a number of negroes were likewise present, among whom were Kit Allen, the mother of Noble's children, and also some of

the children of Noble by her. This man's life, and the human results thereof, naturally made his dwelling place and its surroundings at least the familiar resort of those of the negro race who sprang from him or were attached to him by years of association. When he became seriously ill it was both reasonable and natural that they should gather about him. Among those living on his plantation was a negro woman, Mary Ross, who appears as an attesting witness on the exhibit to the petition. That she was present on this occasion is shown by the evidence beyond cavil. Another person asserted by proponent to have been present and to have witnessed the paper was a white man, William A. Callis. In addition to the more than a half dozen negroes, undoubtedly themselves present, who testified that Callis was present on this occasion, and that he subscribed his name as an attesting witness, O. H. Watson, the justice, testified that Callis was present and attested the paper. W. A. Callis was killed by Ryal Noble in 1902, some time subsequent to the time this paper was "signed" by Noble. Noble was acquitted. It appears from the record to have been the view of contestants that Noble killed him because of Callis' intimacy with Lucy Allen, the daughter of Noble. It also appears in the record that Noble killed him by mistake or accident; that he did not intend to harm or slay Callis, though Callis' attentions to or relations with Lucy were discussed by Kit Allen and Noble, and both at least deprecated the situation or Callis' action. The testimony of all those living about or with Noble before, at, and after July, 1900, goes to show that Callis was then staying at Noble's most, if not all, of the time. Substantially the only evidence opposed or tending to refute that affirming Callis' presence on the occasion of the *signing* of a paper at the time in question are broth-

ers of Callis, who testified that Callis and Noble were unfriendly and were "carrying guns for each other." A. R. Callis also testified that he sat up with and nursed Noble two nights during the illness, in 1900, pending which the will was said to have been written by O. H. Watson. It is hardly probable that such self-sacrificing neighborly kindness would have been extended by a brother of W. A. Callis when, at a time, the sick man and the brother were "carrying guns for each other." T. H. Callis testified: "There was an estrangement between Mr. Noble and Lucy Randolph [Noble's daughter by Kit Allen] on account of her conduct in going off with W. A. Callis. They left the community in which Mr. Noble lived and went away."

On the cross-examination he testified: "Will Callis went to L. R. Noble's house a good deal at one time."

If it is assumed that at or about the time Noble killed W. A. Callis, which occurred in 1902, Noble was resentful and belligerent toward him because of Callis' conduct with Lucy, it is most probable that W. A. Callis was previously at the home of Noble near which Lucy then resided; that that was the period to which T. H. Callis had reference when he said his brother W. A. Callis was at Noble's a good deal. When the "recollection" and the "best recollection" of T. H. Callis as to date of the unfriendly relations between Noble and W. A. Callis existed and the at least unusual, if not unnatural, situation related by the other brother, H. R., who nursed Noble during the illness that induced Noble's effort to make a will, are considered in connection with the testimony of the numerous other persons who were undoubtedly present on the occasion, it must be concluded that T. H. and H. R. Callis are mistaken as *to the time (the period)* during which, if at all, there was enmity between their brother and Noble.

This conclusion is further strengthened by the testimony of Frank Watson to the effect that Lucy, in response to his denial that Noble had made a will giving his property to his children by Kit Allen, and banter of her to prove her assertion by showing the paper to him, brought the paper to him some time during the year it was made (1900) ; that he read it; that it was, as stated, Noble's will; and that the names of W. A. Callis and Mary Ross were upon it as attesting witnesses. This witness is a white man, and his testimony is unimpeached. Lucy testified to the same circumstances. The only effort to discredit Frank Watson's testimony on this matter was by C. O. Sherer, who testified that on one occasion Frank Watson told him he had seen Noble's will, but two or three months later told him he had not seen it. Watson denied this statement. It is not conceivable that Watson, who does not appear to have any interest in the controversy, would lend himself to such a flagrant act of perjury.

We think the conclusion must follow that W. A. Callis was *present* when Noble signed the paper in July, 1900. Being present, as was Mary Ross, the negro woman, it must also be concluded, under the evidence, that they attested the paper as a will. The house in which Noble was ill in July, 1900, contained only a single room. In it the paper was written by O. H. Watson, and signed by Noble. Callis and O. H. Watson and the darkies were in this room. The testimony for proponents includes a number of those who were present when Noble signed, and the attesting was done and the acknowledgment was taken by O. H. Watson. The testimony of the negroes then present of what took place is direct, clear, and without any degree of unnaturalness or improbability. They did not testify as if by

rote. Their statements do not describe the abnormal
or invoke belief of that which would not reasonably be
expected in the light of the circumstances. All the wit-
nesses who were examined as to the event in July, 1900,
were testifying 12 years thereafter. The variations
which appear in the testimony of these witnesses, and
must appear under normal conditions if a fair credi-
bility is afforded, relate to collateral circumstances and
surroundings. For instance, there is difference between
some as to whether Noble had O. H. Watson put the
will in the trunk, or whether Noble first put the will
under his pillow. The main facts are those upon which
there is general agreement by both contestants and pro-
ponents, as before stated, and then the further fact that
these people saw the will signed by Noble and attested
as the statute requires, by Callis and Mary Ross, and
acknowledged by O. H. Watson. Frank Watson saw
the paper within the year it was written, and he says
it appeared to have been attested by Callis and Ross.

The main effort below was, and the insistence here
is, to discredit O. H. Watson by the testimony of 11
witnesses who testify that O. H. Watson said, in sub-
stance, to Glover and to them and to others in their
presence, on different occasions, that there was no men-
tion of personal property in the paper he wrote; that
he wrote the paper, but that it had no attesting wit-
nesses; that, if such appeared on the paper, it was a
case of forgery. O. H. Watson denied that he made the
affirmative statements attributed to him.

Pertinent to the subject under consideration, it was
said in *Barnewall v. Murrell,* 108 Ala. 381, 382, 18
South. 838: "It is undoubted law that any deficiency
in the evidence of subscribing witnesses, as to the due
execution or identity of the instrument, may be sup-
plied by the evidence of other witnesses. If this was

not true, the validity of wills would often depend, not upon the existence of facts rendering them valid, but upon the retentiveness of the memory of the subscribing witnesses.—*Hall v. Hall*, 38 Ala. 131. As was said in this case: 'The law makes two subscribing witnesses indispensable to the formal execution of a will; but it by no means follows that the testimony of these witnesses is the only evidence by which the due execution of the will can be established. On the contrary, it is laid down as undoubted law that if, from forgetfulness, the subscribing witnesses should fail to prove the formal execution of the will, other evidence is admissible to supply the deficiency; or, if the subscribing witnesses all swear that the will was not duly executed, they may be contradicted, and the will supported by other witnesses or by circumstances."

The first headnote to *Skeggs v. Horton*, 82 Ala. 352, 2 South. 110, thus concisely states the rule in this state: "Although a will is required to be attested by two witnesses, a lost will may be established by the testimony of a single witness, who read it, or heard it read, and remembers its contents."

In this case, if every word of the testimony of O. H. Watson was entirely disregarded, the overwhelming weight of evidence sustans the affirmative of the proposition that the paper signed in July, 1900, by Noble, was attested by two witnesses. Indeed, if the testimony of Robert Allen and Joe Allen was also put out of consideration, still the evidence is clear, credible, and conclusive that Noble's will was attested, as the law requires, by Callis and Ross, and that others saw the acts going to perfect Noble's conceded intention to make a will. The only possible way by which to avoid this result is to captiously reject the testimony of Frank Watson, Mary Ross, Lucy Randolph, Kit Allen, Judy Bar-

ron, and Cora Dials. All of these witnesses are negroes, except Frank Watson. Of these only Lucy Randolph has an interest in the instrument sought to be probated. Kit Allen is the mother of the beneficiaries named in the instrument; but, aside from her natural concern (which we assume) that her children, by Noble, should have what the father unquestionably intended they should, upon his death, succeed to, she is without definite, substantial interest in the establishment of the paper propounded. When it is accepted, as it must be under the evidence, that Noble undertook to make a will in July, 1900, at his residence, that acts looking to that end were done, that he signed and acknowledged the instrument written as he directed, and these accepted facts and acts are testified to by these witnesses, it is not perceivable how any just ground could exist for repudiating, as wholly unbelievable, their further testimony that the paper was attested by W. A. Callis and Mary Ross as the law requires. Except the contradictory (to his evidence) statements attributed by 11 witnesses to O. H. Watson, the scrivener, there is no evidence of any degree of positiveness that these persons did not attest the paper. Frank Watson's subsequent denial, as asserted by Sherer, after Watson had told him he had seen the original will of Noble, cannot, if accepted, rise to the dignity of a contradiction that would authorize the disregard of Watson's clear and positive statements, given under oath, sustaining the existence and complete execution of a will by Noble. Besides, Frank Watson is pointedly corroborated by Lucy Randolph. The testimony of these negroes bears on its face no element of improbability. The cross-examination of them disclosed no utterance or circumstance that is inconsistent with substantial truth. Variation in the memory of witnesses and indistinctness as respects de-

[Allen v. Scruggs, et al.]

tails 12 years after the event under inquiry are factors in the consideration of such matters that tend to confirm, rather than refute, the testimony appearing to be not otherwise unworthy of credit. The result is that testimony of credible witnesses, situated to know that about which they testify, is presented on the issue of attestation vel non of Noble's intended will, and there is no real evidence or circumstance against its verity. Our conclusion is that Noble's will was attested by Callis and Mary, and that the unreflected upon testimony is conclusive on that point. It cannot, *on the evidence here,* be for a moment conceived that a gigantic, criminal conspiracy was organized to perjuriously establish a will, duly attested, for Noble.

(8, 9) We come now, in proper order, to the question whether the paper so legally executed, under the statute (section 6172), was, in *substantial parts,* the instrument offered for probate. The proof of the *words* is not required by the law; the *substance* is all that is exacted by the law.—*Potts v. Coleman,* 86 Ala. 94, 100, 5 South. 780. The form or phrase in which the lost instrument is made or couched by the pleader cannot alone determine the result of such an inquiry. So fact and argument against the establishment of a *lost* instrument cannot find just predicate or effective influence *alone* in the form or phrase in which a subsequent writer sees fit to set down a reproduction of that which is lost, for it is the *substance* of the paper that is *lost* to which the law addresses its inquiry. The alleged copy should conform *in substance* to the lost instrument it would reflect; but all those features of an alleged copy, which are matters of *form,* unaffected of the *substance,* are not material to be established to the degree of certainty stated in a forward part of this opinion.

The *substance* (apart, of course, from the execution under Code, § 6172) of the instrument executed in July,

1900, by Noble, was the devise and bequest of property, real and personal, to named persons by a writing testamentary in character. There is no doubting the purpose of Noble, at that time, to do this, nor can there be any doubt on the evidence, for it is without dispute in this connection that Noble then intended to give his estate to his children by Kit Allen. The only evidence of any adverse character is that of the several witnesses for contestants, who testify that O. H. Watson told them the will of Noble did not mention personal property. Every other witness who heard it read or read the paper positively testified that it bequeathed Noble's personal property to these children. Frank Watson so testifies. So do Mary Ross, Lucy Randolph, and Judy Barron. Other evidence and circumstances corroborate these witnesses. And it may be here noted that if, as was undoubtedly the case, Noble intended his real estate to go to his children by Kit Allen, it would be a remarkable, quite unnatural conception to attribute to Noble that his consideration for those who sprang from him should be entirely satisfied by a testamentary disposition of his real estate alone. The *substance* of Noble's will included his personal and real property.

(10) Was the last will lost? The overwhelming proof is to the effect that Noble gave the paper *to his daughter,* Lucy, to keep. This was certainly no unnatural act. She was one of the beneficiaries in the instrument. Noble must have known the instrument was subject to revocation by him. Of course it was in fact. If, as is asserted, she was an immoral woman, surely Noble would not have found in that fact a disqualification to have the custody of a will naming her as one of the beneficiaries, for she was the product of Noble's immorality with Kit Allen. That the instrument was committed to her care by Noble is proven beyond any doubt. And it is

likewise established by the undisputed testimony that Lucy, *on the eve of her removal to Mobile from Choctaw county*, committed the will to the care of Judy Barron, who then lived on Noble's plantation in Choctaw county. Judy took the instrument, wrapped it in some "quilt pieces," tied bundle up, and put it in the bottom of her trunk. Nobody else knew of the will's place of keeping, except Cora Dials, Judy's daughter. Later, when Lucy heard that Judy was going to move or had moved into Clarke county, she came from Mobile, and she and Judy found the will in the stated place in the trunk and looked at it. Shortly after Noble's death Lucy came for the paper. While the wrapping in which the paper had bene put was in its place (the bottom of the trunk), the paper was missing. Diligent search has not discovered it. Who removed it is not explained. The evidence is conclusive that the paper, executed as before stated, was and is lost. It is insisted for appellees (contestants) that the fact that Lucy committed the will to the custody of Judy Barron, an ignorant "fieldhand," without advising the other beneficiaries of that fact, should have a strong influence to reflect upon, if not refute, the testimony going to show the committal of the paper to Judy by Lucy, and in consequence to neutralize the effect of the testimony to show the loss of the paper. We do not think this position well taken. The evidence is without dispute that all of the beneficiaries named in the will, except Berry, who had left some years before, knew that Noble had delivered the paper to Lucy. There does not appear to have been any want of confidence on their part, manifested in this action. That Lucy thought it best to leave the paper in Judy's trunk and under her care, and so without advising her brothers and sister (Alma, since deceased) of it, may quite reasonably have consisted with due cau-

tion, under the circumstance. Undoubtedly Lucy had great confidence in Judy, and the evidence justifies it, unless it is assumed that Judy disposed of the paper—an idea that is not supported by any positive or persuasive evidence. When it is remembered that Lucy was changing her place of residence, and in that connection committed the paper to Judy's custody, and when it is also borne in mind that the legal effect of the paper, if not revoked, was to vest the real and personal property, left by Noble at his death, in his children by a negro woman, and thereby to deflect its possession and enjoyment from his blood relatives of the white race, this action of Lucy's may have been quite reasonably invited by a fair caution to preserve the paper by committing its custody to one in whom she had confidence, and who would not ordinarily be expected by others to have custody of it. The evidence shows that there was general knowledge of the fact that Noble had made a will in favor of his illegitimate offspring. Indeed, it appears from the testimony of Meredith Pugh, one of Noble's next of kin, that on an occasion in the year 1902, when the witness was reconveying to Noble about 700 acres of land Noble had conveyed to witness when he (Noble) was being sued for damages by the administrator of W. A. Callis, who, as stated before, Noble had previously killed, John Kimbrough said to Noble: "What about the will? I know you made a will." Noble [Uncle Ryal] said, "Yes, it's all done made." John Kimbrough, in his testimony, also refers to Noble's having stated on other occasions, beside that mentioned by Meredith, that he had previously made a will. Under the circumstances, whether the action of Lucy in placing the paper with Judy was a precaution inspired by undue anxiety or by a rational apprehension, Lucy's action in that regard cannot, under all the evidence,

be said to have been so improbable or abnormal as to reflect upon the positive testimony that such course she did, in fact, pursue.

(11-14) The remaining question is whether Noble revoked the will of July, 1900. It is not asserted that he made any subsequent disposition of his property by will or subscribed any writing revocatory of his July, 1900, will. So the inquiry narrows to this issue: Was the instrument revoked by any of these acts specified in Code, § 6174, which, as here involved, reads: "* * * A will in writing can only be revoked by burning, tearing, canceling, or obliterating the same, with the intention of revoking it, by the testator himself, or by some person in his presence, and by his direction; * * * and when any will is burned, torn, canceled, or obliterated by any other person than the testator, his direction and consent thereto, and the fact of such burning, canceling, tearing, or obliteration, must be proved by at least two witnesses."

In *Woodruff v. Hundley*, 127 Ala. 640, 653-655, 29 South. 98, 102 (85 Am. St. Rep. 145), these presently pertinent statements of established rule and doctrine were set down: "All declarations of the testatrix subsequent to the making of this will, tending to show that she had revoked it, were clearly incompetent; *no act of revocation having been shown.* [Italics supplied.] * * * In *Law v. Law*, 83 Ala. 434, 3 South. 753, it is said: 'That no revocation can be effected by mere word of mouth or nuncupative declaration, any more than could be done under the English statute of frauds. It requires one or more of the *specific acts* mentioned in the statute—a burning, tearing, canceling or obliterating, with the intention to revoke, or a new will or codicil, properly executed and attested.' [Italics supplied.] * * * Revocation is an act of the mind

which must be demonstrated by some outward and visible sign. * * * 'All the destroying in the world without intention will not revoke a will, nor all the intention in the world without destroying. There must be two.' * * * There must be the act as well as the animus. Both must concur in order to constitute a legal revocation."

When a will remains in the possession of the deceased and is not found at his death, the legal, evidential presumption is that the testator destroyed it, animo revocandi, until the contrary is shown.—*McBeth v. McBeth,* 11 Ala. 956; *Weeks v. McBeth,* 14 Ala. 474. Of course, when the instrument not found or produced was committed by the deceased to another's custody, the evidential presumption stated is not available—has no application or effect. The basis of the presumption, rebuttable, of course (14 Ala. 474), is the conception that the unexplained absence of the will ˉfrom the place referable to the custody of the decedent, which he had retained during his lifetime, naturally suggests his destruction thereof. Here the evidence is conclusive that Noble by his own act committed the will to the custody of another, viz., his daughter Lucy. The burden of proof was therefore upon contestants to establish the revocation of the will. Other than asserted, subsequent declarations of Noble that he had destroyed his will giving his property to the illegitimate children, by Kit Allen, there is no evidence of any *revocatory act* by Noble to that end. It is noted in *McBeth v. McBeth, supra,* that testators frequently make declarations touching their testamentary acts "for the purpose of misleading, and of stifling the importunity of relatives and friends." It may well be that Noble, in such statements as he is said to have made indicating that he had destroyed his will of July, 1900, was exercising the defensive prerogative

[Millitello v. B. F. Roden Grocery Co.]

to which the quoted allusion was made in *McBeth v. McBeth*. The pleaded assertion of revocation by Noble of his will executed in July, 1900, has not been at all sustained. There is not legal evidence to that end.

Our conclusion on the whole case is that the judge of probate erred in refusing probate to the instrument offered for probate as the *substance* of the will executed by L. Ryal Noble in July, 1900; and that the evidence to that end was so strongly supportive of every material fact necessary to be established in order to justify the probate of a lost will as that a trial judge would and should have set aside a verdict of a jury opposed thereto.

The decree of the probate court of Choctaw county is reversed; and one is here rendered directing that court to receive for probate, and to probate as the last will and testament of L. Ryal Noble the instrument offered for probate. The cause is remanded for the purpose of carrying into effect, in that court, the judgment and decree of this court.

Reversed, rendered, and remanded.

ANDERSON, C. J., and MAYFIELD and DE GRAFFENRIED, JJ., concur.