17 So.2d 137

### DEES et al. v. METTS et al.

### I Div. 186.

Supreme Court of Alabama.

Feb. 3, 1944.

Rehearing Denied March 23, 1944.

J. D. Ratcliffe and John M. Coxwell, both of Monroeville, for appellants.

C. L. Hybart, of Monroeville, for appellees.

GARDNER, Chief Justice.

This cause was originally assigned to Mr. Justice BOULDIN. Upon consideration of his opinion by the Court in Division consultation, the writer prepared the following opinion in dissent thereto. And upon further consideration of the cause by the whole Court, the conclusion reached by this dissenting opinion met the approval of the majority and here controls the result. Justice STAKELY concurs in the following opinion in its entirety. Justices BROWN and LIVINGSTON limit their concurrence as indicated in the separate concurring view written by Justice BROWN and found stated below.

The unnumbered charge, given at the request of contestants, and forming the basis of the fourth assignment of error, reads as follows: "The court charges the jury that if the consideration in the deed is so extremely inadequate as to satisfy the conscience of the jury that there must have been imposition, or undue influence, which in the opinion of the jury amounted to oppression, the jury should return a verdict for the contestant."

The deed to which the charge referred recited the consideration as follows: "That for and in consideration of 1 and 00/100ths dollars to the undersigned grantor J. B. Watts in hand paid by Nazarine Parker the receipt whereof is acknowledged."

The principle attempted to be brought forward by this charge could have reference only to a transaction regarding bargain and sale—a vendor and purchaser—such as was considered in Kirby v. Arnold, 191 Ala. 263, 68 So. 17. But it has no application whatever to the deed here in question. There was no bargain and sale. Confessedly, it was a deed of gift, and nothing more. The action of the trial court in giving this charge cannot be sustained upon the theory that it was abstract. To do so would be to permit the application of legal principles to a given case which are entirely foreign thereto, and leading to a definite result. We must assume that the jury gave some consideration to this charge. They had it with them in the jury room. Doubtless they had also with them the deed. They could interpret the charge, when it speaks of the consideration in the deed, only as meaning the recited consideration as found therein. So considered, they are told by this charge that if they view the consideration of $1 as extremely inadequate, this may be considered as indicating undue influence amounting to oppression, justifying a verdict for the contestants.

Looking at it from a practical standpoint, it would appear that would be the only practical construction of the charge. The undisputed evidence was that the real estate described in the deed was worth from $2,000 to $2,500. The jury was bound to know, therefore, that the expressed consideration of $1, as found in the deed, was "extremely inadequate." As a consequence, in practical effect it appears the charge amounted to affirmative instructions in favor of the contestants, so far as the deed is concerned.

Mr. Lee, a reputable attorney of Monroeville, testified concerning the preparation of this deed for Ben Watts. His evidence was to the effect that he had known Watts for a period of 25 years. Watts had consulted him previously about his will, which he had exhibited to him, and Lee had advised Watts that it was quite sufficient to carry out his wishes; i. e., giving his property to Nazarine Parker. Several months later, and a few months before he died,

Watts called upon him again, and asked if he could legally convey his lands to Nazarine Parker reserving the use of his lands during his lifetime, and stating that he anticipated his people might try to break his will; and that "he wanted to do everything possible to make sure that his will would be carried out." Lee advised him such a deed could be made reserving a life estate; and he prepared the deed for him. He further testified that Watts "was absolutely of sound mind, and there was no question about him understanding the nature of the business he was transacting. * * * He was determined and wanted to see that none of his people got any of his money. He stated that this Negro had helped him and taken care of him, and he wanted her to have the property." Lee further stated that Nazarine Parker was not in his office at the time the deed was prepared; that in fact he had never seen her during Ben Watts' lifetime. "I never saw her to know who she was. I do not know where Nazarine Parker is today."

J. B. Barnett had been in the banking business in Monroeville close to 39 years, and had been acquainted with Ben Watts during most of that time. Watts did his banking with the bank in which Barnett was interested, and appears to have been engaged in hauling freight and express in his truck, as well as mail. When money was shipped into the bank, Watts receipted for the bank at the express office, and took money away from the bank to be shipped— this for a long period of years." Barnett testified that Watts was a man of sound mind, "a man of special keenness, and in my judgment he was a man of strong determination. He was not easily persuaded. He was very determined in his ideas."

█ Other business men, including Mr. Dees, the banker who wrote the will for Watts, testified to like effect. Reference is made to some of the testimony as found in the record merely to demonstrate there was abundant proof upon which the jury could rest a finding the deed was executed free from any undue influence. Yet, as I think the jury were bound to construe this charge, they were instructed by the court that the extreme inadequacy of the recited consideration in the deed alone justified its annulment. This, of course, is not the law, and I am fully persuaded inescapable error was committed in the giving of this charge.

█ But my disagreement goes beyond this point and to the very essence of the case. Coming to a consideration of the will, I am unable to find sufficient proof in the record to justify its invalidity. I am, of course, in full accord with all that is said in Mr. Justice BOULDIN'S opinion concerning the policy of our State, as found in our Constitution and statute, intended to prevent race amalgamation and to safeguard the racial integrity of white peoples as well as the racial integrity of Negro peoples. I freely admit, also, as stated in Story v. State, 178 Ala. 98, 59 So. 480, 482, that a universal public opinion prevalent in both races recognizes at least two grades of depravity in matters of illicit relationship. It is reprehensible enough for a white man to live in adultery with a white woman, thus defying the laws of both God and man, but it is more so, and a much lower grade of depravity, for a white man to live in adultery with a Negro woman. As said by the court in the Story case, supra, "Reclamation may be made of [the] one; but, for the other, there is little, if any, hope."

Fortunately, the cases of such depravity are very rare. The contest of the will of one Ryal Noble, found reported in Allen v. Scruggs, 190 Ala. 654, 67 So. 301, furnishes a disgraceful example. The opinion discloses that Noble was a white man coming from an entirely respectable family of people; that soon after the War between the States he began a meretricious association with Kit Allen, a Negro woman who lived on his plantation, and during many years he had his residence in a building nearby to that occupied by her. There were five children born, and to these children he willed his property. At the execution of the will the woman, Kit Allen, was present. The case was very ably presented to this court, and quite an elaborate discussion of the facts and the applicable principles of the law are to be found in the opinion. The will had been lost. The proof satisfied the court that, nevertheless, it had existed, and that it expressed the fixed will of the testator. The result was that the ruling of the probate judge, before whom it was tried without a jury, was reversed and one here rendered admitting the will to probate.

For such meretricious conduct our laws are more severe, the punishment more extreme. Yet it appears that organized

society—the law—took no step to interfere, and the guilty parties left unmolested. One thing, however, is clear, and that is—however reprehensible the conduct and however deservedly severe the punishment, the law forfeits no right to ownership of property of either of the guilty parties, nor challenges the right of free disposal thereof.

It is the settled law of this State that illicit relationship is not sufficient per se to warrant a conclusion of undue influence. And no presumption of undue influence arises merely from the fact that a man who is of sound mind makes a will in favor of his mistress, or in favor of one with whom his relations have been meretricious. Hobson v. Morgan, 215 Ala. 274, 110 So. 406. The distinction in regard to the question of burden of proof as between a will and a deed is fully discussed in Bancroft v. Otis, 91 Ala. 279, 8 So. 286, 289, 24 Am.St.Rep. 904. Undue influence, it was there pointed out, which will void a will must amount to coercion or fraud; and as there said: "There must be some proof of these things." The existence of confidential relations between the testator and the beneficiary under the will must be "coupled with activity on the part of the latter in and about the preparation or execution of the will, such as the initiation of proceedings for the preparation of the instrument, or participation in such preparation, employing the draughtsman, selecting the witnesses, excluding persons from the presence of the testator at or about the time of the execution, concealing the making of the will after it was made, and the like." This, as the opinion points out, will raise up the presumption of undue influence and cast upon the beneficiary the burden of showing it was not induced by coercion or fraud on his part, directly or indirectly; but no such presumption can be predicated alone on confidential relations.

Of course, all the cases recognize that undue influence must be sufficient to destroy the free agency of the testator. And persuasion or argument addressed either to the judgment or affections, in which there is no fraud or deceit, does not constitute undue influence. Gilbert v. Gilbert, 22 Ala. 529, 58 Am.Dec. 268; Knox v. Knox, 95 Ala. 495, 11 So. 125, 36 Am.St.Rep. 235; 28 R.C.L. p. 140.

In Dunlap. v. Robinson, 28 Ala. 100, speaking to the matter of undue influence in connection with the contest of a will made largely to the children of the alleged mistress, to whom it appears, however, a life estate was reserved as to a portion of the property, the Court observed: "Undue influence, as that term is understood in this connection, must be such as, in some measure, destroys the free agency of the testator, and prevents the exercise of that discretion which the law requires a party should possess as essential to a valid testamentary disposition of his property. It is not enough that by the testator's own improper conduct he has brought about a condition of things, over which, at the time of making his will, he had no control to change or remedy, but which, as a moral inducement, operated upon his mind, influencing him to make a disposition of his property which, under other circumstances, he might not have made."

In 28 R.C.L. p. 137 is found the following: "Undue influence such as will invalidate a will is not easy to define with precision. It must be such as to control the mental operations of the testator, overcome his power of resistance, and oblige him to adopt the will of another, thus producing a disposition of property which the testator would not have made if left freely to act according to his own pleasure."

And in the more recent case of Abrams v. Abrams, 225 Ala. 622, 144 So. 828, 830, concerning the execution of a deed charged to have been produced by undue influence, the Court observed: "It is not influence, it must be remembered, but undue influence, that is charged and necessary to be proven to overthrow this transaction, and such influence as is the result of sympathy and affection only is not undue influence condemned by the law."

It must be such influence, as therein stated, as dominates the grantor's will and coerces it to serve the will of another in the act of conveying. And in this connection the court considers the matter of dominant party. In the instant case testator was of the "dominant race," so recognized and emphatically so stated by the court in Story v. State, supra. And the dictates of common sense tell us that this unlawful relationship must have been initiated by Watts himself, and the proof is abundant that he in fact was a man of determined will.

Mr. Dees, who wrote the will at the Monroe County Bank where Ben Watts came to see him for that purpose, had

known Watts since 1920. Watts came into the bank and asked him to go with him in the directors' room, where he informed him he wanted to make a will; "that he wanted some white man to represent him to act as executor of the will, and he wanted me to do it and represent him." The witness then continues: "I said, 'Mr. Ben, you have been doing business with us a long time here and if there is any way I can help you, I want to do it,' and he said 'I want you to draw up a will and I want to fix it up this morning. * * * I want to leave what I have for this Negro woman that has been taking care of me all the time. You know how white people are about Negroes, and I want to be sure this thing is handled right because I want her to have what I've got. All my own people have ever done for me was to borrow money and never pay it back. I want to see that she gets it, and' I want to see that some white man sees that she does get it.'"

Dees was named executor without bond, and propounded the will for probate. Nazarine Parker was not present. Watts came to the bank practically every day, and he talked with him nearly every day. Dees testifies: "From my relations with him and from what I was able to observe, I would say that Ben Watts was a man of very sound mind. He was a man of strong determination. I would not think he could be easily swayed from his judgment." He further added that Watts "was a successful man."

J. B. Barnett, the banker, testified to like effect as to Ben Watts' mental capacity. And Mr. G. B. Barnett, who is engaged in the hardware business in Monroeville, likewise testified that Watts was a man of sound mind and of strong determination. J. T. Moore, engaged in the insurance business and funeral director, thought he had a "pretty bright mind" and was a man of strong determination. Dr. Smith, a practicing physician since 1912, had known Watts for years. He thought he was a "man of absolutely sound mind." Another merchant; the post office clerk; the sheriff of the County; Mr. Lee, the attorney; Mr. Salter of the newspaper business, who had considerable dealing with him and saw him frequently; and others engaged in business in Monroeville, testified to like effect. Some of the witnesses also indicate that Watts made some contributions in aid of the support of his people, but to what extent it is not at all clear.

The only evidence offered by contestants seeking to impeach the testimony of these business men of Monroeville had relation to Watts' conduct at the home of his mother, where his brother and sister and some of his relatives lived, and where he often took his midday meal. If this testimony is to be given its full credence, he acted most shamefully in the abusive language used; and in his conduct displayed unusual temper. The record shows, however, that his mother, and perhaps some of the others of the family also, remonstrated with Watts concerning his disgraceful way of life. His conduct would appear clearly to have been the result of resentment on his part for their attempted interference. Indeed, he had at last built a smaller house for himself near the larger house where Nazarine Parker lived.

But all this considered, it is clear enough from the proof that Ben Watts was a man of perfectly sound mind and one of strong will power. Indeed, the original opinion holds nothing to the contrary. And in considering the matter of the probate of the will, the question of testamentary capacity should be kept in mind. It was stated very simply by this court in Eastis v. Montgomery, 95 Ala. 486, 11 So. 204, 205, 36 Am.St.Rep. 227, in the approval of the following charge: (If the testatrix) "had mind and also memory enough to recollect the property she was about to bequeath, and the person to whom she wished to bequeath it, and the manner in which she wished it to be disposed of, and to know and understand the business she was engaged in, then, in contemplation of law, she had a sound and disposing mind; and her great age and bodily infirmity * * * do not vitiate a will thus made." The test, thus stated, is given general recognition. 28 R.C.L. p. 86.

The record shows that his prejudice towards his relatives was largely the result of his resentment of their criticism of his conduct, but in no event did any such prejudice as here shown serve a purpose to reflect upon his testamentary capacity. 28 R.C.L. p. 104–108. And the same may be said as to display of violent temper as above indicated. 28 R.C.L. p. 89. But this question need be pursued no further, as we have observed the opinion in no manner questions his testamentary capacity,

and as I view it, is rested solely upon the ground of undue influence.

According to those who knew him, he was not easily to be swayed from his own idea of things. He was a bachelor and preferred to live this life of shame and face the criticism, or perhaps ostracism, that would naturally follow. A reading of this record, however, tends to indicate that so far as the business men with whom he came in contact all the years are concerned, he was not ostracized, but continued to enjoy their confidence and continued to carry on business with them as usual.

However boldly he may have defied the laws of our State and its public policy, and the recognized traditional racial distinctions, organized society took no steps to interfere. Freedom of religion, so sacredly guaranteed to us, and which we cherish so highly, is freedom not only to worship according to the dictates of one's own conscience and to follow whatever religion one desires, but it is also a freedom, if one chooses, to have no religion at all. And so far as one's conscience is concerned (and this, of course, is wholly aside from the violation of our State law), there is a freedom also in the moral world for one to choose his own way of life. Ben Watts chose the evil way. But whatever may be said in condemnation of his manner of life, and however disgraceful and reprehensible it may have been, the courts must not lose sight of the fact that his accumulated estate, valued at some $3,500, was his own; and it is clearly shown from this record, beyond the peradventure of a doubt, that he wanted this estate to go to Nazarine Parker. As pointed out in Abrams v. Abrams, supra, while a court of equity would be astute to discover signs of fraud, imposition, and unfair dealing, and eager to thwart their evil ends, yet "in doing so, it must be extremely careful not to interfere with that right of free disposal which inheres in the ownership of property, and not to defeat the uncoerced wishes of its owner."

Nazarine Parker is shown by this record to have taken no part whatever in the execution of this will, and was not present at the time of its execution. A jury question upon the matter of undue influence is sought to be presented by what some witnesses state as to what she said in regard to the matter being "fixed" by the will and deed. Giving full credit to this testimony, it could to my mind, be construed at best only as a boast. Certainly, it fails to show any such activity on her part as to create any presumption of undue influence. I have been unable to find in the books where a mere statement of that character has been permitted to turn the scale and cast the burden of proof.

The conversation with Mr. Dees shows clearly the determined will of Ben Watts to dispose of his property as he has. Not only so, his subsequent consultation with Attorney Lee and his final execution of a deed reserving to himself a life estate, add confirmation to this fact.

The courts are not concerned with the matter to whom this property goes, but we should be greatly concerned lest we destroy the right of free disposal of property, which is inherent in its ownership. However sinful Ben Watts may have been, and however disgraceful his conduct, if he was of sound mind and not unduly influenced, the courts are bound to give respect to his wishes, just as was done by this court in Allen v. Scruggs, supra.

I am fully persuaded the record discloses no valid reason in law why the determined will of Ben Watts should not be upheld by the courts.

I am, therefore, persuaded that the proponent was entitled to the affirmative charge on the question of undue influence, which was duly requested.

Reversed and remanded.

BROWN, LIVINGSTON, and STAKELY, JJ., concur as above indicated.

THOMAS, BOULDIN, and FOSTER, JJ., dissent.

BROWN, Justice (concurring).

I concur in the opinion of the Chief Justice holding that the court erred in giving the unnumbered charge set out in his opinion.

I am also of the opinion that the court erred in giving Charge "E" dealing with the question of undue influence touching the execution of the deed. That charge assumes that the grantee was the dominant party and ignores the issue raised by the evidence showing that the grantor sought and received competent independent advice. McQueen v. Wilson, 131 Ala. 606, 31 So. 94.

I am further of the opinion that the court erred in overruling the motion for a new trial. The verdict of the jury on the issue of incompetency and undue influence, both as to the execution of the deed and the execution of the will, is against the great weight of evidence and should not be allowed to stand.

LIVINGSTON, J., concurs in the foregoing view.

BOULDIN, Justice (dissenting).

Prevention of race amalgamation, safeguarding the racial integrity of white peoples and the racial integrity of negro peoples, is the fixed public policy of Alabama.

It is written into our Constitution in these words: "The legislature shall never pass any law to authorize or legalize any marriage between any white person and a negro, or descendant of a negro." Article IV, § 102, Constitution of 1901.

It finds legislative expression in our miscegenation statute, which reads: "If any white person and any negro, or the descendant any negro intermarry, or live in adultery or fornication with each other, each of them shall, on conviction, be imprisoned in the penitentiary for not less than two nor more than seven years." Title 14, § 360, Code of 1940.

The background of this public policy and the social status thereby conserved found expresssion in Story v. State, 178 Ala. 98, 103, 59 So. 480, 482, in these words: "The social status, as respects the white race and the negro race, in this state is universally known. The general relation of the races, each toward the other, is kind and cordial to a most marked and gratifying degree; and the impulse the dominant race manifests toward the inferior race is that of a commendable guardianship and abundant generosity, inspired by motives not only of fundamental justice but of sentiment engendered by the earlier legal dependence and subjection of the slave to the master. While this honorable condition is obvious and prevails, yet the social relation and practices of the races have, in the interest of our civilization as well as in expression of the natural pride of the dominant Anglo-Saxon race and of its preservation from the degeneration social equality, between the races, would inevitably bring, imperatively necessitated and created immutable rules of social conduct and social restraint, that the just ends indicated might be attained and permanently maintained. Since the fundamental, initial suggestion of the social separation of the races is conceived in nature and is nurtured by a social pride and self-respect that only ignorance or unholy purpose can question or assail, it was and is the natural result that laws should be enacted promotive of the social purpose of the dominant race. Among these are: The inhibition against the authorization or legalization of marriage between any white person and a negro, or the descendant of a negro (Const. §§ 102, 182); the penal prohibition of marriage between these races."

We are now confronted with a case involving the validity of a will made by a white man bequeathing his entire estate to a negro woman with whom he was living in a state of adultery or fornication, followed by a deed of gift conveying to her his real estate, reserving its use and enjoyment during his life.

After his death the alleged will was offered for probate by the executor therein named. A contest was instituted by next of kin of decedent on the grounds of undue influence and mental incapacity. The cause was transferred to the circuit court for trial.

A bill in equity was also filed in the circuit court to cancel the deed upon like grounds. By agreement the cases were consolidated and the issues submitted to a jury who found both instruments invalid.

Among the questions here presented is whether there was evidence of undue influence presenting a jury question; and, if so, whether a new trial should have been granted because of the great weight of the evidence on that issue.

The evidence disclosed that decedent and beneficiary were living together in a state of adultery or fornication at the time the will was executed and for many years prior thereto; that the same illicit and criminal relation continued to the time of making the deed, some two years after making the will, and continued to the death of decedent, some five months after making the deed. This evidence was not controverted, and is not challenged on appeal.

Further evidence disclosed they lived together in the residence owned by decedent which, with some acreage connected therewith, was covered by both will and deed, and constituted the greater portion of decedent's estate.

Other evidence was to the effect that decedent kept up a day-time connection with his family, taking his mid-day meal at the family residence in the same neighborhood; that he had, without cause, long conceived an intense dislike for his kindred, including a brother, a sister and an aged mother, all of whom pre-deceased him; that he was abusive and menacing in his manner, speaking to and of his people in contemptuous terms, with most opprobrious epithets, etc.

There was no direct evidence of activity of the beneficiary in the procurement of the will.

We quote, however, from the testimony of Leonard Wiggins, husband of a niece of decedent, one of the next of kin and heir at law. This witness said: "One time I had a conversation with Nazarine Parker, in which the will and deed were mentioned. I was talking to her one Sunday, and she said she had every damn thing fixed. She said that Ben Watts fixed her a will and she was afraid that damn thing wouldn't hold, and she said she told him to go and fix her a deed, 'honey', they might break the will."

Nevada Nelson, testifying as an intimate neighbor having full knowledge of their illicit relation, said: "She would tell him what she wanted and he would give her what she asked for. She told me that he had willed her every damn thing he had, and that she was going to get it."

Dill Brooks testified she cooked for them and, among other things, said: "She just called him good names, she never did say anything ugly to him. I never heard him refuse her any request she made, nor ask for anything that he would refuse. He always shelled it out to her."

Proponent's evidence, in substance, disclosed a fixed purpose of the decedent to will his property to the negro woman, who, he said, had helped him and taken care of him all the time; disclosed he was apprehensive of a contest of the will, wanted a white man as executor to see that the devisee got the property; that the deed was executed on his insistence as an additional muniment of title in case the will was defeated. Nazarine was not present when either instrument was executed.

We are not here concerned with the question of the invalidity of transactions because in contravention of public policy, as, for example, a conveyance of property in consideration of entering into or continuance of illicit sexual relations between the parties. We are concerned with whether a will or gift of his estate by a white man to a negro woman with whom he is living in a state of adultery carries implications peculiar to such situation, which may, in connection with other facts, support a finding of undue influence.

There are special elements in the peculiar confidential relations existent between the parties.

The man, in such case, gets his consent to a way of life made a continuous felony by the laws of his state, a higher offense, than in case of such relation between persons of the same race. He faces a loss of respect on the part of friends and neighbors of his own race, the better element of both races; is probably ostracized to a degree by the social laws of his community; sacrifices his own self-respect; humiliates his family, his blood relatives. All this in a special and peculiar measure in cases of this sort.

Keeping up such criminal relations at such a price may be considered by the jury in connection with all the evidence, and found to support a reasonable inference, that the man has become so infatuated with his negro mistress as to render her the dominant party in matters of special interest to her. Her alleged declarations above quoted carry reasonable implication of her activity in procuring the will and deed, and also of her sense of power to get what she wanted; the role of a mistress, rather than that of acquiescence or servile submission to the dominant will of the man. The credibility of the witnesses was for the jury.

The inspiration and objective of his ugly, intimidating attitude toward his kindred, without any evidence of good reason therefor, was for the solution of the jury in the light of all the circumstances. There was some evidence of efforts on their part to change his way of living. Whether his fixed purpose to give the property to his paramour as insistently declaimed to the draftsman of both instruments was the expression of his own will, or a mere echo of her will, was a jury question. Proof of illicit relations is not alone sufficient to show undue influence in will cases. Evidence of such relations is admissible in connection with other evidence tending to show undue influence. Hobson v. Morgan, 215 Ala. 274, 110 So. 406; Shipman v. Furniss, 69 Ala. 555, 44 Am.Rep. 528.

What we have written suffices to indicate that illicit relations between the white man and the negro woman has special implications to be considered with all the other evidence in passing upon the issue of undue influence.

The evidence made a clear case for the jury on that issue; and there was no such state of evidence as would justify a reversal of the judgment denying a motion for new trial upon the ground that the verdict was not supported by the evidence. Undue influence may be shown by circumstantial evidence as other issues of fact.

Bequests by a father to his illegitimate child or children rest on a better basis, legally and morally. They are of his own blood. Dunlap v. Robinson, 28 Ala. 100; Allen v. Scruggs, 190 Ala. 654, 67 So. 301; Johnson v. Johnson, 206 Ala. 523, 91 So. 260.

There was some evidence of mental incapacity. This, under our practice, called for a submission of that issue to the jury. We need not consider the great weight of the evidence on that question. The verdict was general. There was no special finding on that issue. The evidence supported a finding of both instruments invalid on the ground of undue influence. Indeed, under the evidence, and the law of undue influence in will cases, and the law relating to gifts inter vivos, the jury could not well have found the will invalid and the deed valid and effective. Shipman v. Furniss, supra; Bancroft v. Otis, 91 Ala. 279, 289, 8 So. 286, 24 Am.St.Rep. 904; Young v. Love, 186 Ala. 292, 65 So. 337.

Charges A, C and E, given for contestants, state principles of law as quite literally announced in Shipman v. Furniss, supra. That case involved a deed of gift, not a will. These charges, by their terminology, when carefully read, disclose they were directed to the deed. If misleading, explanatory instructions were in order. Since illicit relations between the parties was not controverted, charge E was not erroneous in assuming such relation as a fact.

Charge No. ——, given for contestants, states a correct principle of law in cases of vendor and purchaser. Kirby v. Arnold, 191 Ala. 263, 68 So. 17, and cases there cited.

Under the unquestioned evidence the deed here involved was a deed of gift. Its recital of a consideration of one dollar, in some forms of action, stamps it as a voluntary conveyance. Technically, the charge was abstract. Nevertheless, the jury having before it a deed reciting: "That for and in consideration of One and 00/100 Dollars, to the undersigned grantor J. B. Watts in hand paid by Nazarine Parker the receipt whereof is acknowledged I the said J. B. Watts Single do grant, bargain, sell and convey unto the said Nazarine Parker the following described real estate, to-wit:", we cannot see how the giving of the charge, in view of the clear instructions of the trial court as to the issue presented as to the will and as to the deed, worked injury to appellant. If misleading in failing to confine the finding to the deed, an explanatory charge was in order.

A non-expert witness is incompetent to testify that, in his opinion, another person had a specific disease, unless the symptoms of the disease are so discernable to ordinary observation that one of ordinary intelligence and experience may form a sound judgment thereon. Mutual Life Ins. Co. v. Mankin, 223 Ala. 679, 138 So. 265; 32 C.J.S., Evidence, § 513, pp. 198, 199.

Where the witness, as here, testifies his knowledge of decedent's having syphilis was derived from the statement of decedent, not from his own knowledge, the above rule has no application.

I, therefore, dissent.

THOMAS and FOSTER, JJ., concur in the foregoing.