(No. 33406.—

LOUISE D. STERLING, Appellant, *vs.* JOSEPHINE E. DUBIN *et al.,* Appellees.

*Opinion filed May 20, 1955.*

Lyle L. Richmond, and Nat M. Kahn, both of Chicago, for appellant.

Harry I. Parsons and Frank J. Smith, both of Chicago, for appellees Josephine E. Dubin *et al.*; Seymour S. Price, of Chicago, special administrator to defend, *pro se.*

Mr. Justice Klingbiel delivered the opinion of the court:

Louise Sterling brought an action in the circuit court of Cook County to set aside the will of her deceased husband on the grounds of mental incapacity and undue influence exerted upon him by Josephine Dubin, his private

secretary, to whom he left a substantial legacy. The case was tried by a jury and a verdict was returned upholding the will. Plaintiff's motions for a new trial and for judgment notwithstanding the verdict were denied, and a decree was entered on the verdict. A freehold being involved, plaintiff appeals directly to this court, contending that the verdict is against the manifest weight of the evidence, that proper evidence offered by plaintiff was excluded; that the trial court displayed prejudice against plaintiff in the presence of the jury, and that the court improperly sustained objections to portions of the closing argument of her attorney. Error is also assigned on the giving and refusing of certain instructions.

The testator, William Sterling, died in Chicago on March 24, 1951, at the age of 44. He was survived by his widow, the plaintiff, and two daughters. His will, which was executed four days before his death, provided for a $5000 legacy to a sister, a $10,000 legacy to defendant Josephine Dubin, and gave all household furnishings and personal effects to plaintiff. The residue of his estate was bequeathed and devised in trust for the benefit of his two daughters. The will was admitted to probate in the probate court of Cook County on December 28, 1951. The estate included personal property valued at about $45,000, and real estate having a value in excess of $30,000.

At the time of his death Sterling was treasurer, vice-president and director of a large manufacturing corporation, and was in charge of all tax accounting and financial operations of the company and its stock transfer department. His income was about $40,000 per year. He resided with his family in Winnetka. Their home was purchased by Sterling in 1944, title being taken in plaintiff's name. Some time prior to April of 1950 marital troubles arose between Sterling and his wife, and he rented a room in the Congress Hotel in Chicago. An intimate relationship thereafter developed between Sterling and defendant Jose-

phine Dubin. For some five or six years she had been employed, as his private secretary, by the company for which he worked. She was about twelve years younger than he. She accompanied him on social occasions, and they would frequently have dinner together. It further appears that she had sexual relations with Sterling on several occasions. In November or December of 1950 he asked her whether she would marry him if he obtained a divorce and she said she would do so because they loved each other.

On January 26, 1951, Sterling complained of feeling ill after having dinner with Miss Dubin at the Congress Hotel. He drove her home, and then proceeded to his Winnetka home. A physician was called, who determined that Sterling was suffering from a heart ailment. He was admitted to a hospital on the next day, where he remained until March 10, 1951. While Sterling was in the hospital he was treated with a drug called dicumarol. His physician testified that the drug is a dangerous one and could cause hemorrhages anywhere in the body, including the brain; that personality changes sometimes occur as a result of the drug; that in cases of coronary thrombosis and infarction mental symptoms appear to some extent; that patients become more emotional, and that the symptoms include irritability, moodiness, emotional instability, confusion and anxiety. The doctor further testified, however, that he was satisfied with Sterling's reaction to the drug and his general reaction to treatment during convalescence.

During his confinement in the hospital Miss Dubin visited him at least once a day and talked to him by telephone on matters of business several times a day. Mrs. Sterling, on the other hand, visited her husband on only five occasions. The last visit, which occurred on February 25, was the last time she saw or talked to him during his lifetime. There is evidence that she was forbidden by her husband to visit him in the hospital and that his doctor

advised her to stay away. Sterling telephoned her only once during the time he was in the hospital.

In February, while Sterling was in the hospital, his doctor at his request informed Mrs. Sterling that her husband wanted her to bring him their insurance policies, which had a total face value in excess of $35,000. These she delivered to Sterling, who then changed the designated beneficiary from his wife to his daughters. He delivered them to Miss Dubin, who handled the necessary details to effect the change of beneficiary. Mrs. Sterling did not learn of the change until after his death. On February 24, Sterling telephoned his wife, telling her that they were going broke and would have to borrow money on certain jointly held stock certificates in order to pay the hospital bill. He asked her to get them out of their safe deposit box and deliver them to him at the hospital. The following day she gave him the stock certificates, together with signed stock powers, and thereafter Miss Dubin delivered them to the company for transfer into Sterling's name alone. He did not make a loan on the stock. It is undisputed that he was not in straightened circumstances, and had ample funds to meet his expenses. Sterling also dictated a series of letters to Miss Dubin by which he cancelled all charge account authority of Mrs. Sterling at some twelve or thirteen stores. Because of his anxiety about finances, Mrs. Sterling transferred the title to their home into his name alone and caused the deed to be recorded. She did not tell her husband about the deed, and he had no knowledge of it.

While in the hospital Sterling dictated to Miss Dubin a long letter addressed to certain attorneys in Mexico with reference to obtaining a divorce, with which there was enclosed his power of attorney, authorizing the attorneys to proceed with the divorce, and a power of attorney purportedly signed by his wife as defendant in the proposed suit and notarized by Miss Dubin as notary public. Mrs. Sterling had no knowledge of the attempted divorce, or

the power of attorney bearing her purported signature, until she learned about it after her husband's death; and she contends here that the signature was forged by her husband. After Sterling's death, Miss Dubin sent a telegram to the attorneys in Mexico advising them of the death and instructing them to stop any pending divorce action. In reply she received a letter returning the check that had been sent for the fee, and stating that it also contained the power of attorney of Mrs. Sterling. The disputed power, however, was not produced at the trial in the case at bar, defendants' counsel testifying that it may have been lost or misplaced by himself or Miss Dubin.

On March 10, 1951, Sterling moved from the hospital to a room in the Stevens Hotel. Thereafter Miss Dubin occupied his room in the Congress Hotel. On March 17, a few days after Sterling had incurred a fall and had suffered a "blackout," he told Miss Dubin he wished to dictate a document, and asked her to bring her steno book to the Stevens Hotel the next day. On March 18 she came to his hotel room with her notebook, as requested, and Sterling then proceeded to dictate his will. There was no discussion of its contents either before or after the dictation. The only comment about any part of the will occurred when Sterling dictated the provisions in which the bequest to Miss Dubin is set forth. At this point she stopped taking dictation, and Sterling explained that in case she should feel bad after his death the bequest would provide funds for her to go away. Miss Dubin transcribed her notes in draft form at the company office the next day and delivered the draft to Sterling, who made some changes in language by means of notes and interlineations on the draft, and returned it to Miss Dubin with a request that she draw up the finished document. After the document was prepared in final form Miss Dubin, at Sterling's request, arranged for certain witnesses to come to the hotel. The will was executed on March 20 at the Stevens

Hotel room, in the presence of three business associates of Sterling, who acted as witnesses. Miss Dubin was not present when the will was signed, but later received it from Sterling with instructions to place it in the company vault. This she did.

The provisions of the will concerning the legacy to Miss Dubin read in part as follows:

"Fourth: I hereby give and bequeath the sum of Ten Thousand Dollars ($10,000.00) to my secretary and dear friend, Josephine E. Dubin, now residing at 4831 N. Rockwell Street, Chicago, Illinois. This bequest is an expression of my appreciation for her many years of devoted and loyal services to my business career since 1938, and to her counsel, assistance and helpfulness during the several times in which I became ill after May 1948."

The fifth clause of the will, containing provision for Mrs. Sterling, is in the following language:

"I hereby give and bequeath unto the woman with whom, with her knowledge, I entered into an illegal marriage contract in Charleston, South Carolina on January 18, 1936, and who calls herself, LOUISE D. STERLING, all of my household furniture and other personal effects now located at 9 KENT ROAD, WINNETKA, ILLINOIS, of which I may still be possessed at my death, and in the event she predeceases me, such property shall go, in equal shares, to my beloved daughters, LOUISE MARGARET and BARBARA JEAN, who shall survive me. These household and personal effects are bequeathed with the knowledge that their value exceeds one-third (⅓) of the total estate of the Testator, and in the event any attempt is made by said woman, now known in Winnetka, Illinois under the name of LOUISE D. STERLING, to dispute any of the terms of this Will, then in that event, she shall, in lieu thereof, be given the sum of One Dollar ($1.00) and all of the effects given under this Clause FIFTH shall then go, in equal shares, to my said daughters, who shall survive me. The Testator considers the bequeathing of said household and personal effects, having a value far in excess of Twenty-Five Thousand Dollars ($25,000), to be ample recognition of any real or fancied rights possessed by the aforesaid woman, in view of the fact that she repeatedly made attempts upon his life, many times expressed the hope that his death would occur at as early a date as possible, and generally made his life, while sharing the same address with him, as miserable as she could."

Sterling's marriage to the plaintiff herein had taken place some few days prior to the date of a final divorce decree terminating his previous marriage. It was stipulated at the trial, however, that the marriage was a lawful one, and that at Sterling's death the plaintiff was his lawful surviving spouse.

Between March 10 and March 24 Sterling and Miss Dubin spent some time together alone on almost every day, either at the Stevens Hotel or at the Congress Hotel. On March 23, after they had dinner together in the room at the latter hotel, Sterling complained of feeling tired. When he hesitated about going back to the Stevens she insisted that he spend the night there at the Congress Hotel. Sterling went to sleep in the bed, while Miss Dubin slept in a chair. In the early morning hours of March 24 Sterling awoke suddenly, complaining of a nightmare, and shortly thereafter died. The cause of death was attributed to myocardial infarction.

Plaintiff contends the evidence clearly establishes undue influence on the part of defendant Dubin. It is argued a confidential relationship to Sterling was proved by the evidence of their illicit sexual relationship; the fact that she was his private secretary for a long period of time and handled his money while he was in the hospital without giving any receipt; her assistance in transferring the stock and insurance policies, and in the attempt to obtain a divorce; and the constant reliance upon her help while he was in the hospital. Plaintiff also points to the testimony of Miss Dubin that Sterling trusted her, and to the provision in the will referring to "her counsel, assistance and helpfulness during the several times in which I became ill after May 1948." It is then urged that, in view of the confidential relationship, her "participation" in the preparation of the will and in arranging for the presence of witnesses raised a presumption that the will resulted from her undue influence. The evidence in this record,

however, does not show either that a fiduciary relationship existed or that Miss Durbin was instrumental in procuring the execution of the will. The mere facts that she had illicit sexual relations with Sterling and that she was his private secretary do not establish a fiduciary relationship. Special confidence and trust on one side and domination and influence on the other must be proved before such a relationship is shown. (*Moneta* v. *Hoinacki,* 394 Ill. 47.) There is nothing in the case at bar indicating that Miss Dubin had superiority and influence over the testator, or that he had ever depended upon her advice and counsel in any business transactions. Moreover, even if a fiduciary relation existed, such fact alone is not sufficient to cast upon her the burden of showing an absence of fraud and undue influence. There must in addition be evidence tending to show she was in some way instrumental in procuring the execution of the will. (See *Ginsberg* v. *Ginsberg,* 361 Ill. 499.) All that is shown in the present record is that Miss Dubin performed ordinary secretarial duties in taking and transcribing notes and following the directions of Sterling. Such activities obviously cannot constitute a participation in the transaction within the meaning of the rule creating a presumption of undue influence. It is true that Miss Dubin is one of the chief beneficiaries, and that the testator was seriously ill when he made the will. There is no testimony, however, tending to show that any of the provisions were included at her suggestion, or that she exerted any undue influence over the testator. She had no discussions with him, either before or during the dictation of the will, concerning the extent and disposition of his property, nor was she present when the will was executed. To vitiate a will, undue influence must be directly connected with the execution of the instrument and must be operating when the instrument is executed. (*Downey* v. *Lawley,* 377 Ill. 298.) Moreover, it must be such as to deprive the testator of a free agency, and render the will

more that of another than his own. Influence resulting from affection does not constitute undue influence sufficient to set aside a will freely and understandingly made. (*Knudson* v. *Knudson,* 382 Ill. 492; *Wickes* v. *Walden,* 228 Ill. 56.) In any event, the evidence together with all reasonable inferences to be drawn therefrom, taken in the aspect most favorable to defendants, well supports the verdict in favor of the will. In such cases the verdict will not be disturbed on appeal. (*Judy* v. *Judy,* 261 Ill. 470.) It is well established that in will contests the rule is the same as in trials at law, and that the finding of the jury will be upheld unless it is manifestly against the weight of the evidence. (*Mitchell* v. *Van Scoyk,* 1 Ill. 2d 160.) The issue in this case was peculiarly within the province of the jury, and the record contains no justification for disturbing its conclusion in the matter.

The same result must follow on the issue of mental capacity. The record shows that the testator, a successful executive, transacted his own business and the business of his employer both during and after his stay in the hospital, and continued to supervise the work of his subordinates. The will itself indicates the testator had the ability to express himself in a capable and intelligent manner and knew the extent of his property. The testimony of the subscribing witnesses that he was of sound mind and memory when he signed the will is uncontradicted by any evidence except the testimony of the plaintiff herself. Mrs. Sterling, who had apparently made some study of psychology, testified that from her observation of certain conduct and statements of her husband during the last year of his life, she was of the opinion that he had a psychopathic personality and was a paranoiac. While other evidence in the record discloses unfairness and an unreasonable anger toward plaintiff, it does not impel the conclusion that the testator was mentally deranged and lacked the capacity to make a valid will. The value of plaintiff's

testimony is affected not only by her interest in the litiga-
tion but also by her behavior during the last two months
of her husband's life, when she turned over to him the
insurance policies and stock certificates, and caused their
home to be conveyed to him. Such acts are hardly con-
sistent with a belief that he was incompetent to transact
ordinary business and to dispose of his property.

It is clear the evidence in this record is not such as to
require a finding that the testator lacked sufficient mental
capacity to make a valid will, and it would serve no useful
purpose to review it in detail. It is well settled that one
who is capable of transacting ordinary business affairs in
which his interests are involved is capable of making a
valid will. Sickness and infirmity alone do not show lack
of testamentary capacity nor is unreasonable prejudice
against the natural object of his bounty ordinarily a ground
for invalidating a will. (*Logsdon* v. *Logsdon,* 412 Ill. 19;
*Schmidt* v. *Schmidt,* 201 Ill. 191.) There is ample evi-
dence in this case to support the verdict finding the testator
to be of sound mind and capable of making a valid will.
Where the evidence on the issues of mental competency
and undue influence in a will contest is conflicting, that
on either side being sufficient, alone, to sustain a verdict
for that side, the jury and the trial judge are in a better
position to determine the issues than is a reviewing court,
and a judgment upholding the will will not be reversed on
the evidence unless the verdict is contrary to the manifest
weight thereof. See *Sulzberger* v. *Sulzberger,* 372 Ill. 240.

Plaintiff insists that the court erred in refusing to give
instructions 25 and 31, describing the elements of lack of
testamentary capacity, that the court failed to give any
instruction whatever on the elements of testamentary
capacity; and that the jury was thus left without guid-
ance or criteria by which to determine this issue. Instruc-
tion 25, requested by plaintiff and refused by the court, is
as follows: "The court instructs the jury that though you

believe from the evidence that the testator at the time of making the will involved in this suit had sufficient capacity to attend to the ordinary business affairs of life, yet, if you further believe from a preponderance of the evidence that with regard to subjects connected with testamentary disposition and distribution of his property and the natural objects of his bounty he was of unsound mind and memory and while laboring under such unsoundness of mind and memory he signed the alleged will in question, and that in making and signing it he was so influenced and controlled by such unsoundness of mind and memory as to be unable rationally to apprehend the nature and effect of the provisions of said alleged will as he did then you must find the alleged will not be the will of the said William T. Sterling." Instruction 31, also requested by plaintiff and refused, reads as follows: "If the jury believe from a preponderance of the evidence that, although William T. Sterling had sufficient capacity to attend to the ordinary business affairs of life, yet that with regard to subjects connected with the testamentary disposition and distribution of his property and the natural objects of his bounty he was of unsound mind, and that while laboring under such conditions he made the will in question, and that in making it he was so far influenced or controlled by such unsoundness of mind as to be unable, rationally, to comprehend the nature and effect of the provisions of the will, and was thereby led to make the will, as he did, then the jury must find the will not to be the will of the said William T. Sterling."

These instructions are evidently based upon the theory that Sterling was the victim of a delusion regarding persecution and threats by his wife, for which there was no reasonable foundation in fact, and that evidence of irrational acts and conduct showed he was of unsound mind in regard to the testamentary disposition of his property and the natural object of his bounty. In the absence of

evidence from which a jury could find the existence of an insane delusion, an instruction advising the jury that one may be capable of transacting ordinary business and yet incapable of making a valid will because of unsound mind and memory does not correctly state the law. (*Noone* v. *Olehy,* 297 Ill. 160; *Rowcliffe* v. *Belson,* 261 Ill. 566.) A person who has sufficient capacity to attend to the ordinary business affairs of life is ordinarily possessed of such soundness of mind as the law requires for the execution of a will. A testator may, however, have an insane delusion with respect to the testamentary disposition of his property and the natural object of his bounty. Even though possessed of sufficient mental capacity to execute a will generally, he may be of unsound mind upon a particular subject and may, under the influence of that unsoundness of mind, be incapable of acting rationally. The instructions in question refer to such a case, and their propriety must depend upon whether the record contains evidence sufficient to warrant a finding that Sterling was the victim of an insane delusion.

Several instances of strange and unusual behavior of the testator are disclosed in the record. Plaintiff testified that during the last several years of her husband's life his attitude toward her was characterized by abrupt changes; that one moment he would seem to love her and the next moment he seemed to hate her; and that on one occasion he made an attempt to kill her. While in the hospital he accused her, without any basis in fact, of appropriating his stock certificates, and several instances are shown of unreasonable antagonism and hatred toward her. The evidence fails to show any justification or reason for the statements made in the will that the plaintiff repeatedly made attempts upon testator's life; that she entered into an illegal marriage with him; and that she generally made his life miserable. Plaintiff further relies upon evidence that testator thought he was going broke when such was

obviously not the case, and upon the recitation in the will that his household furniture and personal effects, which the evidence shows were worth only $1624.30, had a value far in excess of $25,000. It is argued that a sane man of Sterling's financial ability and experience would not have so miscomprehended the value of his household and personal effects. Other examples of unnatural behavior are relied upon as evidence of an insane delusion, but we think enough has been mentioned to show that the instructions submitted were proper under the state of the evidence. (See *Catt* v. *Robins,* 305 Ill. 76; *Dowie* v. *Sutton,* 227 Ill. 183.) While an insane delusion which will render one incapable of making a will is difficult to define, we have observed that it may be said to be present where a testator, without evidence of any kind, "imagines or conceives something to exist which does not exist in fact, and which no rational person would, in the absence of evidence, believe to exist." (*Snell* v. *Weldon,* 243 Ill. 496.) We further said in the case cited that where injustice, unfairness, prejudice or anger habitually appear in respect to the same subject without any reason and are adhered to after their falsity is demonstrated, they become strong and satisfactory evidence of a mental derangement. Under the circumstances shown in the case at bar the jury should have had at least one instruction on the question of insane delusion. This was an important issue in the case; and the proposed instructions submitted by plaintiff, while they could have been improved in form and language, were correct in substance. We conclude that the court erred in refusing to give either of the instructions tendered, and that in view of the conflict in evidence the error was sufficiently prejudicial to require a new trial.

Objections are urged as to the giving and refusing of other instructions, and plaintiff also complains of various rulings on admissibility of evidence and on remarks of counsel, as well as other matters. We have examined such

contentions and find that most of them are obviously without merit. A determination of such other contentions in detail is unnecessary to a decision of the cause, however, and they will not therefore be considered.

For the reason discussed the decree is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*