522 P.2d 1081

**Irene M. PARRISELLA, Appellant,**

v.

**George FOTOPULOS and Chris Fotopulos, Appellees.**

**No. 11519-PR.**

Supreme Court of Arizona,
En Banc.

May 31, 1974.

Otto H. Linsenmeyer, by Arthur R. Buller, Phoenix, for appellant.

Kenneth P. Clancy, Phoenix, for appellees.

HAYS, Chief Justice.

This is a will contest case, tried to a jury in the Superior Court. After a verdict for the contestants, a judgment was entered in their favor and the proponents appealed. In a memorandum decision, the Court of Appeals affirmed and we granted review. The decision of the Court of Appeals is vacated, the judgment of the Superior Court is reversed, and the will is ordered admitted to probate.

The testator, who was called Gus, was a rollicking, roistering, heavy-drinking woman chaser. For awhile he lived with his parents, but even then he was maintaining an apartment where he entertained girls, most of whom were considerably younger than he. He owned and operated a profitable bar.

He took up with an employee of his bar, Irene Parrisella, who thereafter lived with him. He gave her an engagement ring and publicly announced his intention to marry her. She was the sole beneficiary of his will. He had two brothers, Chris and George, the contestants of his will.

Gus had chronic asthma and an intestinal disorder, both of which he neglected until one day he was taken to the hospital with massive internal bleeding. While there he demanded that Irene call his lawyer to draw up his will, leaving everything to her. She did so, and her mother picked it up and delivered it to the hospital where it was executed. He died after surgery a few days later.

The only issue tried was whether Irene had used undue influence on Gus to make the will as it was made.

We have read the 900-page transcript. After the opening statements by the lawyers, the next fifty pages are devoted to testimony proving the will.

In this part of the transcript, one registered nurse testified that she witnessed the execution of the will; that she considered Gus to be mentally alert and fully competent; that he refused all medication until the will had been drawn and executed;

that Irene was present; that he said he disliked his brothers; that he showed genuine affection for Irene; that he read the will before signing it, and his only complaint was that he did not want to leave $1.-00 to each of his brothers. At this point, the will was offered and received in evidence without objection.

A second attesting witness was also a registered nurse. She testified that she witnessed the will; that the testator was fully aware of the contents of the will; that he was not under any duress, but signed it and said it was just what he wanted; that he refused all medication until he had taken care of the execution of the will; that he said he did not want his brothers to have anything, referring to them as "S.O.B.'s"; that Irene suggested he call one of his brothers, but he told her not to do so.

His physician and friend of many years testified that Gus was mentally sound and alert, even the day after he was admitted to the hospital; that he was a stubborn man who refused to go to the hospital many times before the day he was admitted; that he did not like to have his brothers visit him because they upset him and made his asthma worse; that he felt very affectionate towards Irene and wanted her present at all times.

The next 300 pages of the transcript are devoted to evidence introduced by the contestants, and the rest of the transcript contains evidence rebutting that of the contestants. In this opinion, we disregard all of the rebuttal testimony because we have accepted all of the contestants' evidence as true, but we have concluded that there is not the slightest bit of evidence to prove undue influence exercised at the time the will was made. If there were any, it would be incumbent upon us to allow the verdict and judgment to stand. We cannot set aside a jury verdict simply because we would have decided the issues differently. Schmerfeld v. Hendry, 74 Ariz. 159, 163, 245 P.2d 420 (1952). So long as there is competent evidence to sup-

port the verdict, it must be allowed to stand. *Id.*

Five witnesses were used to bring out the facts from which the contestants asked the jury to find undue influence. The sum total of their testimony is as follows: The testator was divorced with no children, and he lived in Phoenix from 1941 until his death in May, 1970. Years before Gus's death, his brother Chris loaned him $3,000 to help him open the bar. By 1970 Gus's health was getting worse and he made considerable use of a room in the rear of his bar for resting and sleeping—sometimes with Irene who worked there. Irene did not want Chris to stay at Gus's house when he came to Phoenix for their mother's funeral, although he stayed there anyway. Irene claimed she did not know the contents of Gus's will, but this could hardly have been true because she telephoned the lawyer to give him Gus's instructions for drawing it. Irene said that if the brothers came to Gus's funeral she'd run them off. While Gus was in the hospital he asked Irene to try to find his brother Chris to "help her run" the bar. The proponent's lawyer prepared the will the way Irene told him to do so over the phone, but Gus had previously discussed making a will with the same provisions some time before. The will, when dictated, was picked up by Irene's mother and taken to Gus at the hospital. Gus was engaged to Irene and she wore his engagement ring. Gus's brother George was told by a friend that Irene would not let him stay at Gus's house after the funeral, so he stayed in a motel, without checking this out with Irene. Gus's brother Chris helped paint and remodel the bar several times, but was never paid for it. Irene had told a witness that she would pay another witness to stay in Detroit. After the funeral of Gus's mother, Irene tried to get everyone to go to Las Vegas. Irene tried several times to get Gus to marry her, but he always said he was paying her to work at his bar and if she didn't like her arrangements, she could "get her ass out." After Gus's death, Irene said the brothers would not be

allowed to stay in his house "unless they did right" and that they might think they were going to take over, but weren't. Irene said she hated Chris and that he bothered both her and Gus when he was around.

■ The above includes basically everything that was said from which the jury could have found undue influence. In Arizona, undue influence is defined as conduct by which a person unduly influences a testator in executing a will, when that person through his power over the mind of the testator makes the latter's desires conform to his own, thereby overmastering the volition of the testator. In re Estate of McCauley, 101 Ariz. 8, 415 P.2d 431 (1966). Nothing in the evidence of the contestants comes close to fitting this definition.

■ It has been held that when a person occupying a confidential relation to the testator, is active in procuring the execution of a will and is also named as the principal beneficiary, there is a presumption of undue influence. In re Estate of Vermeersch, 109 Ariz. 125, 506 P.2d 256 (1973). This, however, is inapplicable to the facts of this case for several reasons.

First, the phrase "confidential relationship" refers to the testator's doctor, guardian, religious advisor, partner, employer, landlord, business associate, etc. 94 C.J.S. Wills § 239, page 1093. In Dees v. Mets, 245 Ala. 370, 17 So.2d 137 (1944), the Court had before it a case where a testator left his estate to his mistress. The Court stated:

> "It is the settled law of this state that illicit relationship is not sufficient per se to warrant a conclusion of undue influence. And no presumption of undue influence arises merely from the fact that a man . . . makes a will in favor of his mistress." 17 So.2d at 139.

In Arizona, we have clearly set out the applicable criteria in In re Estate of Vermeersch, *supra,* as follows:

> "With regard to undue influence, again the law presumes that Mrs. Ver-

meersch was not acting under undue influence when she executed her will. . . . The presumption would switch to one of undue influence if the following facts were true: (1) that Jules Vermeersch occupied a confidential or fiduciary relationship to the decedent, (2) that he was active in the preparation of the will, and (3) that he was the sole beneficiary. . . . [T]he marital relationship is not one of the confidential relationships giving rise to the presumption of undue influence." 506 P.2d at 259.

All three requirements must be present before this presumption can arise. Vermeersch, *supra*. However, there is no evidence that Irene occupied a confidential relationship with Gus; in fact, just the opposite appears. The record shows that as far as he was concerned, if she didn't like the treatment she was getting, she could leave. That is not the position of a man whose will has been overpowered by his mistress.

The Iowa Supreme Court, in a similar situation said:

". . . was a man of very definite ideas . . . and he managed his own affairs without interference or suggestions from other people. Were a jury to hold such a man was unduly influenced by Katherine so that his will was really the expression and will of Katherine, and not the free expression of his own will, under the record in this case, they would have to resort to strained and unreasonable conclusions and inferences. Frank . . . had the power to dispose of his property by his will. Our duty is not to criticize the conduct or morals of [Frank] or Katherine. . . . 'The testator, if he chooses, may be actuated by base motives. The only essential is that the will which prompted him to make the bequest must be the will of the testator.'" Glider v. Melinski, 238 Iowa 140, 149, 25 N.W.2d 379, 384 (1947).

In Sterling v. Dubin, 6 Ill.2d 64, 126 N. E.2d 718 (1955), the facts are also nearly the same as in the instant case, and the Court's language included the following:

"It is argued a confidential relationship to Sterling was proved by the evidence of their illicit sexual relationship . . . that Sterling trusted her. . . . The evidence . . . does not show . . . that a fiduciary relationship existed. The mere facts that she had illicit sexual relations with Sterling and that she was his private secretary do not establish a fiduciary relationship." 126 N.E.2d at 722–723.

In another similar situation, the Court in In re Lavelle's Estate, 122 Utah 253, 248 P.2d 372 (1952), said:

"Their illicit relationship was undoubtedly one of the factors which induced the affection Mrs. Lavelle had for Hogg. . . . [S]he spoke of their plans for marriage . . . She gave him sums of money . . . and items of personal property during her lifetime. Respondents urge that this supports their contention of undue influence; but to the contrary, the fact that they were given, and over a considerable period of time, is strong indication of the constancy of her affection and regard for him and corroborates the idea that she wanted to make provision for him in her will. Where the affection and desire of a testatrix is genuine, it matters not that the illicit relationship may have played a part in inducing it." 248 P.2d at 376.

In order to prove undue influence of the kind required to invalidate a will, such influence must not only be shown to have been exercised by one in a confidential relationship, but also must be shown to have been present *at the time of the execution of the will. See* Vermeersch, *supra*, which refers to testamentary capacity rather than to undue influence, but is very clear that attention must be directed to the situation at the time the will is executed in preference to some previous time. In the instant case, not even an attempt was made to

show this last requirement. It is uncontested that Gus was in the intensive care unit of the hospital, under the watchful eyes of registered nurses. He was refusing medication in order to prevent any later charge that he was under sedation, and he was making demands for his lawyer to draw his will and for a notary public to witness a power of attorney which he also signed.

The contestants argue that proponent's appeal is from the order denying her motion for a judgment notwithstanding the verdict or a new trial. They cite Rule 59(b), Arizona Rules of Civil Procedure, 16 A.R.S. The State Bar Committee note appearing on page 461 of 16 A.R.S. states that a motion for judgment notwithstanding the verdict will not lie unless it was preceded by a motion for a directed verdict made *at the close of all of the evidence*. Such a motion was not made at that point in time; it was made at the close of contestants' case. But Rule 50(a), Arizona Rules of Civil Procedure, states that a party who moves for a directed verdict *at the close of the evidence offered by the opponent*, may offer evidence in the event the motion is not granted "without having reserved the right so to do and to the same extent as if the motion had not been made." We think the failure to repeat the motion for a directed verdict cannot bar the motion for judgment notwithstanding the verdict, so long as no further evidence was introduced by the contestants. The motion was timely made at the close of contestants' case and should have been granted. Nothing was changed or waived by the additional evidence offered by proponent in rebuttal. There still was no prima facie case of undue influence by the contestants.

The decision of the Court of Appeals is vacated. The judgment of the Superior Court is reversed with directions to admit the will to probate.

CAMERON, V. C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.