IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**YVETTE ROSENBERG,**
*Plaintiff/Appellant,*

*v.*

**MARILYN KOKE SANDERS,**
*Defendant/Appellee.*

No. CV-22-0170-PR
**Filed December 11, 2023**

Appeal from the Superior Court in Maricopa County
The Honorable Andrew J. Russell
No. CV2018-013707
**AFFIRMED**

Opinion of the Court of Appeals, Division One
253 Ariz. 279
**VACATED**

COUNSEL:

Mark House (argued), Andrea B. O'Neill, Amanda L. Barney, Becker & House, PLLC, Scottsdale; and Eileen Dennis GilBride (argued), Jones, Skelton & Hochuli P.L.C., Phoenix, Attorneys for Marilyn Koke Sanders

David L. Allen, David N. Farren (argued), Jaburg & Wilk, P.C., Phoenix, Attorneys for Yvette Rosenberg

JUSTICE KING authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, LOPEZ, BEENE, and MONTGOMERY joined.

---

JUSTICE KING, Opinion of the Court:

¶1        Alex Brandt signed a beneficiary deed leaving two of his properties to Marilyn Sanders on his death.   After Brandt's death, his niece, Yvette Rosenberg, sued, claiming that Sanders procured the deed through undue influence.   The trial court entered summary judgment for Sanders.

¶2        Nearly sixty years ago, this Court set forth eight non-exclusive factors that are "treated as significant indicia of the presence or absence of [undue] influence" in the execution of a testamentary document.   *In re Estate of McCauley* ("*McCauley*"), 101 Ariz. 8, 10–11 (1966). We must now determine whether statements that a grantor made *after* executing a deed should be considered as a new ninth factor under the *McCauley* inquiry, and whether Brandt's alleged post-execution statements are relevant to Rosenberg's undue influence claim.

¶3        Although we decline to add a new ninth factor to *McCauley*, we recognize that a post-execution statement may be relevant in some cases alleging undue influence.   But that is not the case here.   Brandt's alleged post-execution statements are irrelevant to Rosenberg's undue influence claim.   We affirm the trial court's grant of summary judgment in favor of Sanders.

## BACKGROUND

¶4        Brandt and Sanders first met and began dating in California during the late 1980s.   Brandt proposed to Sanders in 1994, and they moved to Arizona.   They never married.

¶5        Brandt purchased three properties in Arizona—one home where Brandt and Sanders resided and two rental properties.   The titles to the two rental properties were originally conveyed to Brandt and Sanders as joint tenants with rights of survivorship.   After Brandt and Sanders

2

broke up in 1997, Sanders transferred the titles on both rental properties to Brandt.

¶6        Thereafter, Brandt began dating Marilyn Mishkin.   In 2001, Brandt signed a beneficiary deed naming Mishkin as the beneficiary of his home and two rental properties upon his death.   In 2004, Brandt sold one of the rental properties.   Brandt and Mishkin also never married, and they broke up in approximately 2005.

¶7        Thereafter, Brandt executed a new beneficiary deed naming Rosenberg as the beneficiary of his home and one remaining rental property (collectively the "Properties") upon his death.   Rosenberg, who lived in Canada, was the daughter of Brandt's sister, Susan Rosenberg ("Susan"). According to Rosenberg, Brandt spoke over the phone with Susan "almost every day" and with Rosenberg "regularly," and he was very close to both of them.   Brandt had no family in Arizona.

¶8        Brandt and Sanders resumed a relationship between 2006 and 2008.   Although Sanders had been living in California, she eventually returned to Arizona.   Sanders purchased a condominium for herself in Peoria, but at some point she moved in with Brandt.

¶9        Brandt's health began to deteriorate in late 2016.   He was taken to the emergency room and hospitalized on different occasions up until his death in 2018.   From late 2016 to early 2017, Sanders cooked Brandt's meals and drove him to doctor appointments and the hospital. Nonetheless, Brandt still drove himself very short distances.

¶10       Brandt was hospitalized from March 9 to 11, 2017, and his discharge summary noted "cognitive impairment," "memory loss," and "consult neurology."   On March 30, 2017, however, another doctor referred to Brandt's insight as "normal" and conversation as "appropriate." Then, in June 2017, Brandt's primary care physician noted that Brandt was complaining of "fatigue" and "not thinking as clearly as normal."   But in September 2017, Brandt received a routine physical exam and obtained a perfect score on a cognitive assessment.   Brandt had various other medical issues in 2017, including fatigue, weight loss, weakness, blurry vision, diabetes, and kidney disease.

¶11          On April 6, 2017, Brandt executed a deed naming Sanders as the beneficiary of the Properties upon his death ("2017 deed"), and Rosenberg was removed as the beneficiary. On April 12, 2017, Brandt recorded the 2017 deed with the Maricopa County Recorder's Office, and the deed became a public record. *See* A.R.S. § 33-405(E) ("A beneficiary deed is valid only if the deed is executed and recorded as provided by law in the office of the county recorder of the county in which the property is located before the death of the owner or the last surviving owner.").

¶12          Sanders testified at her deposition that Brandt presented the 2017 deed to her as a birthday gift two months later (in June 2017) and that she did not know that he had signed the deed prior to her birthday. Sanders also produced an affidavit of her friend, Cynthia Brown, stating that a couple of days after Sanders' birthday, "Alex mentioned to me that he had put [Sanders'] name on the deed to his real property as a birthday present to her."[1] Although Rosenberg disputes these assertions, she did not produce any evidence to the contrary.

¶13          At her deposition, Rosenberg testified as follows concerning the 2017 deed:

Q. Do you have any belief or any evidence to support that Alex didn't prepare this document?

A. I don't have any belief either way. I don't have evidence either way.

Q. So he signs the document April 6th. It's recorded on April 12th. Do you have any evidence to suggest that he is not the one that directed it to be recorded?

A. I don't have any evidence either way.

Q. Do you have any evidence to suggest that he didn't prepare it?

---

[1] In her response, Rosenberg did not object to Brown's affidavit on hearsay grounds.

A.   I don't have any evidence either way.

Q.   Do you have any evidence at all that Marilyn was active in the procurement of this document?

A.   I don't have any evidence either way.

¶14    According to Rosenberg, Brandt never told her or other family members about executing the 2017 deed.   But Rosenberg testified at her deposition that, with the sole exception of when he named Rosenberg on the beneficiary deed in 2005, Brandt did not discuss his financial affairs with her.   In addition, Rosenberg did not produce any evidence that she had asked Brandt what he had done with the deed or that his silence with relatives on this type of financial matter was unusual.

¶15    In late-May 2018, nearly fourteen months after Brandt executed the 2017 deed, he became very ill and was taken to the emergency room with "a 48 hour history of altered mentation," hypotension, and a recent history of pneumonia.   He was hospitalized for several days.   On June 2, 2018, Brandt wanted to leave the hospital, but medical staff concluded that he should remain because he was "not decisional."

¶16    Rosenberg spoke with Brandt over the telephone while he was in the hospital, and she described him as "very distressed." Thereafter, Rosenberg and Susan traveled to Arizona to visit Brandt. Rosenberg claims that Brandt made several statements to her at the hospital—specifically, that he was "afraid of" Sanders, "she was trying to kill him and steal his assets," "she had taken his cell phone, thereby preventing him from calling" Rosenberg and Susan, and "he wanted the hospital to block [Sanders] from coming to his room or from talking to him on the phone."   Rosenberg further claims that Brandt asked her to cancel the credit card he gave Sanders, "check the status of his checking and credit card accounts to determine whether [Sanders] accessed his cash funds," and "retrieve the contents of his safety deposit box because he was concerned that [Sanders] would attempt to remove the contents."

¶17    On June 3, 2018, a hospital psychiatrist visited Brandt to assess his mental capacity.   He described Brandt as "alert, oriented, and pleasant and cooperative."   The psychiatrist's report noted that Brandt

was "being treated for an acute respiratory decompensation" and "requir[ed] oxygen to maintain his saturation." Although he previously did not have capacity to leave the hospital while he was recovering from his infection, "his mental status [was] improving." The psychiatrist further noted in the report, "The patient states that he no longer trusts his domestic partner with whom he has lived over the past 10 years. He did not want to get into details, but his family is concerned that she may [be] trying to take advantage of him by getting him to sign paperwork about his rental properties." The psychiatrist concluded that Brandt had capacity to make medical decisions, including the designation of a power of attorney.

¶18 On June 4, 2018, Brandt signed a Power of Attorney appointing Rosenberg as his agent with respect to his personal finances. Brandt also signed a Medical Power of Attorney appointing Susan to make medical decisions on his behalf. On June 5, 2018, Brandt was discharged from the hospital, and he returned home with Sanders.

¶19 On September 1, 2018, Brandt passed away at his home. After Brandt's death, Sanders informed Rosenberg of the 2017 deed.

¶20 Rosenberg filed suit against Sanders, seeking to invalidate the 2017 deed as a product of undue influence. Sanders moved for summary judgment. After briefing and oral argument, the trial court addressed each of the eight *McCauley* factors and concluded that Rosenberg had "not presented evidence from which a reasonable trier of fact could conclude that [Sanders] unduly influenced Mr. Brandt into executing the [2017] Beneficiary Deed." Because there were "no genuine issues of material fact in dispute on this point," the court entered summary judgment for Sanders.

¶21 The court of appeals largely agreed with the trial court's findings as to the eight *McCauley* factors, stating that "Rosenberg did not present enough evidence to defeat summary judgment under the *McCauley* factors alone." *Rosenberg v. Sanders*, 253 Ariz. 279, 283–84 ¶¶ 20–32 (App. 2022). But the court went on to determine that "our de novo review of this record reveals a ninth factor"—a "[s]tatements of [g]rantor" factor. *Id.* at 284–85 ¶¶ 32–34 (noting "the *McCauley* factors are not exclusive"). The court explained that, because the trial court "focused on the *McCauley* factors, [it] did not consider Brandt's alleged statements from 2018, while hospitalized, fourteen months after he signed and recorded the 2017 deed."

*Id.* at 284 ¶ 33. When considered, the court believed "this evidence barely frames a material question of disputed fact" and thus "the record had just enough evidence to create a factual dispute and defeat summary judgment." *Id.* at 284 ¶ 33, 285 ¶ 38. The court therefore reversed and remanded for trial. *Id.* at 286 ¶ 40.

¶22      We granted review to determine whether a grantor's post-execution statements should be added to the eight-factor *McCauley* inquiry as a new ninth factor, an issue of statewide importance. This Court has jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

¶23      Under Arizona Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Summary judgment must be granted where "the facts produced in support of the [non-movant's] claim . . . have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990).

¶24      We review de novo a grant of summary judgment. *Delgado v. Manor Care of Tucson AZ, LLC*, 242 Ariz. 309, 312 ¶ 10 (2017). "Because the superior court granted summary judgment, we review the facts and reasonable inferences in the light most favorable to . . . the non-moving party." *Id.* at 311 ¶ 2.

### A. Should This Court Add A Grantor's Post-Execution Statements As A New Ninth Factor Under *McCauley*?

¶25      Under Arizona law, "a person unduly influences a testat[or] in executing a will when that person through his power over the mind of the testat[or] makes the latter's desires conform to his own, thereby overmastering the volition of testat[or]." *McCauley*, 101 Ariz. at 10 (cleaned up).

¶26      *McCauley* sets forth a non-exclusive eight-factor inquiry to determine when a testamentary document has been procured through

undue influence.   *Id.* at 10–11.   These eight factors that "have been treated as significant indicia of the presence or absence of such influence" are:

> Whether the alleged influencer has made fraudulent representations to the testat[or]; whether the execution of the will was the product of hasty action; whether the execution of the will was concealed from others; whether the person benefited by the will was active in securing its drafting and execution; whether the will as drawn was consistent or inconsistent with prior declarations and plannings of the testat[or]; whether the will was reasonable rather than unnatural in view of the testat[or's] circumstances, attitudes, and family; whether the testat[or] was a person susceptible to undue influence; and whether the testat[or] and the beneficiary have been in a confidential relationship.

*Id.* (cleaned up).

¶27        As a threshold matter, we must consider whether to add the post-execution statements of a grantor as a new ninth factor under *McCauley*.   We decline to do so.   The post-execution statements of a grantor are more properly characterized as a *type of evidence* that may support one of the existing eight *McCauley* factors.   For example, if a grantor's post-execution statement is relevant and admissible under the Arizona Rules of Evidence, it may support the alleged influencer's fraudulent representations to the grantor (first *McCauley* factor), the alleged influencer's active participation in securing the drafting and execution of the document (fourth *McCauley* factor), the consistency or inconsistency of the document with the grantor's other declarations and plannings (fifth *McCauley* factor), or the grantor's susceptibility to undue influence (seventh *McCauley* factor).   Thus, we conclude that adding post-execution statements to the *McCauley* inquiry as a new stand-alone factor is unnecessary.

¶28        This, however, does not result in a per se exclusion of all evidence of a grantor's post-execution statements.   Courts may consider all evidence that is admissible and relevant to a claim of undue influence. *See* Ariz. R. Evid. 401, 402.

¶29          "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."   Ariz. R. Evid. 401.   On the issue of relevance in the context of an undue influence claim, *In re O'Connor's Estate* is instructive:

> We said in *In re Greene's Estate*, . . . 'Evidence as to mental condition before or after the execution of the will is important only in so far as it tends to show mental condition *at the time of the execution of the will*.'
>
> . . . .
>
> [W]e are concerned here with the actual mental condition of the testatrix . . . *at the time of the execution of the will* in question, at which time all witnesses present testified that she was calm, composed and knew what she was doing. We are concerned with evidence of her mental condition before and after that time only insofar as it tends to show her mental condition *at the time she executed the will*.

74 Ariz. 248, 257–58 (1952) (emphasis added); *see also id.* at 260–61 (concluding that the evidence of O'Connor's condition when she executed the will did not support the jury's finding of undue influence).

¶30          In addition, *In re Harber's Estate* provides guidance:

> Although the evidence shows that Mrs. Harber had extensive hospitalization toward the end of her life, there is no indication she was in a physical or mental condition which rendered her susceptible to the exertion of undue influence upon her *at the time of the execution of her will*. It is necessary for the contestants to introduce sufficient evidence to show that the testatrix' will was overpowered and the will of another substituted in its stead, in order for a jury to find that the will was a product of undue influence.

102 Ariz. 285, 291–92 (1967) (emphasis added); *see also In re Vermeersch's Estate*, 109 Ariz. 125, 127 (1973) ("This court . . . is not concerned with a generally deteriorated mental condition; the law is concerned only with the state of the testat[or's] mind *at the time of the execution of the will*." (emphasis

9

added)).   Arizona law "is very clear that attention must be directed to the situation at the time the will is executed in preference to some previous time."   *Parrisella v. Fotopulos*, 111 Ariz. 4, 7–8 (1974) (concluding the contestants did not establish this requirement that undue influence was "present [a]t the time of the execution of the will").

¶**31**        Accordingly, a grantor's post-execution statement is relevant to an undue influence claim if it addresses the grantor's state of mind or mental condition, or the circumstances present, at the time of the execution of the document.   This includes whether the post-execution statement was consistent or inconsistent with the executed document, which is the fifth *McCauley* factor.   *See McCauley*, 101 Ariz. at 11, 15 (concluding the will was "entirely inconsistent with decedent's oft-repeated purpose to exclude" her former and current husbands from sharing the property).   Indeed, this is consistent with the Court's long-standing assessment of how post-execution statements evidence the testator's state of mind at the time of execution.   *See In re Vermeersch's Estate*, 109 Ariz. at 129 (relying on a testator's "declarations made to the nurse at the rest home months after the will was executed," as the will "was absolutely consistent with [these] declarations"); *In re Harber's Estate*, 102 Ariz. at 291–92 (concluding that evidence of testator's hospitalization and doctor's comment about her deteriorating health did not support undue influence because it only spoke to her susceptibility after she executed her will, not "at the time of the execution of her will"); *In re O'Connor's Estate*, 74 Ariz. at 261 (concluding there is no evidence of undue influence where "the many repetitions of deceased to different people of her intent to dispose of the property as she did in the will . . . shows a permanent fixed mind to carry out [her] plan"); *In re Westfall's Estate*, 74 Ariz. 181, 184 (considering evidence that two witnesses, who saw testatrix and had a conversation with her "at the signing of the will and not in excess of 40 minutes," testified "that she was competent"); *see also In re Frick's Estate*, 13 Ariz. App. 247, 248, 252–53 (1970) (considering, as part of the *McCauley* inquiry, testator's statements made in letter dated about one month after execution of will).

### B. Are Brandt's Alleged Post-Execution Statements Relevant?

¶32        We now consider whether Brandt's alleged post-execution statements in the hospital in June 2018 are relevant to Rosenberg's undue influence claim.

¶33        As an initial matter, we disagree with the court of appeals that before granting summary judgment, the trial court "did not consider Brandt's alleged statements from 2018, while hospitalized, fourteen months after he signed and recorded the 2017 deed." *Rosenberg*, 253 Ariz. at 284 ¶ 33.   The trial court explained in its order that it had "reviewed and considered" Sanders' motion for summary judgment, Rosenberg's response, Sanders' reply, the parties' respective statements of fact, the arguments made by counsel at oral argument, and "the record in this matter" before ruling on the motion.   We observe that Rosenberg's response, statement of facts, and declaration all discussed Brandt's alleged statements in the hospital in June 2018.   Thus, the record demonstrates that the trial court in fact considered Brandt's alleged post-execution statements, even though it did not specifically address them, before granting Sanders' summary judgment motion.   *See Fuentes v. Fuentes*, 209 Ariz. 51, 55–56 ¶ 18 (App. 2004) ("Although the trial court's signed minute entry does not specifically detail [the husband's] financial situation, the foregoing evidence is presumed to have been fully considered by the court prior to issuing its decision.").

¶34        Here, Brandt's alleged post-execution statements in the hospital were made fourteen months after he executed the 2017 deed. They did not reference his state of mind, his mental condition, or the circumstances present when he executed the 2017 deed, nor did they reference how he planned to distribute the Properties.   Instead, the alleged statements only speak to Brandt's then-current state of mind and mental condition at the time of his hospitalization in June 2018—specifically, that he was afraid of Sanders and no longer trusted her.   While such statements may demonstrate his feelings toward Sanders in June 2018, they do not address his state of mind, his mental condition, or the circumstances

present "at the time of the execution of" the 2017 deed.[2] *See In re O'Connor's Estate*, 74 Ariz. at 257–58; *In re Harber's Estate*, 102 Ariz. at 291–92; *In re Vermeersch's Estate*, 109 Ariz. at 127; *Parrisella*, 111 Ariz. at 7.

¶35 Brandt's alleged post-execution statements in the hospital are not relevant to whether Sanders exerted undue influence upon Brandt when he executed the 2017 deed or whether that deed was the product of undue influence. The post-execution statements are therefore inadmissible. *See* Ariz. R. Evid. 402. For that reason, we need not address the parties' arguments about whether the post-execution statements are inadmissible hearsay.

### C. Did The Trial Court Err In Granting Summary Judgment In Favor Of Sanders?

¶36 Finally, we turn to whether the trial court erred in granting summary judgment for Sanders.

¶37 Arizona law presumes that a person who executed a deed did so free from undue influence. *See* A.R.S. § 14-2712(B) ("It is a rebuttable presumption that a person who executes a governing instrument is presumed to have capacity to execute the governing instrument and to have done so free from undue influence and duress."); A.R.S. § 14-1201(28) (defining "governing instrument" to include a "deed"). A party challenging the validity of a deed has the burden of establishing its invalidity by a preponderance of the evidence. *See* A.R.S. § 14-2712(D).

¶38 Arizona law provides, however, that an inverse presumption arises that a deed was the product of undue influence if the alleged influencer either (1) had a confidential relationship with the decedent, was active in procuring the creation and execution of the deed, and is a principal beneficiary of the deed, or (2) prepared the deed and is a principal

---

[2] We do not place a specific timeframe on the relevance of post-execution statements for undue influence claims. We cannot state, as a matter of law, that a relevant statement transforms into one that is irrelevant in all instances after a specific amount of time has passed between a document's execution and a post-execution statement. In each case, the trial court must determine the relevance and admissibility of each alleged post-execution statement under the Arizona Rules of Evidence.

beneficiary of the deed. *See* A.R.S. § 14-2712(E)(1)–(2). Here, Sanders produced evidence that Brandt gave the 2017 deed to her two months after its execution as a birthday gift, and she did not previously know he had signed the deed. Rosenberg did not produce any evidence to contradict these points. Further, Rosenberg did not produce any evidence that Sanders prepared the 2017 deed, or actively participated in procuring its creation and execution. Based on this lack of evidence, Rosenberg has failed to establish the factors under § 14-2712(E)(1)–(2). Therefore, the inverse presumption does not apply for the benefit of Rosenberg.

**¶39** In our de novo review of the grant of summary judgment, we conclude that Rosenberg did not produce evidence creating a genuine dispute as to any material fact on the first six *McCauley* factors.

(1) <u>Did Sanders make fraudulent representations to Brandt</u>? Rosenberg did not produce evidence that Sanders made fraudulent representations to Brandt through which she "attempted to obtain control over [Brandt] and to alienate [him from his] family . . . in order to supplant [his] confidence in these people and promote [her] own advantage." *McCauley*, 101 Ariz. at 13. Rosenberg did not create a genuine dispute as to any material fact on this factor.

(2) <u>Was the 2017 deed's execution the product of hasty action?</u> Rosenberg did not present evidence that Brandt's execution of the 2017 deed was hasty. Instead, Brandt executed it two months before presenting it to Sanders as a birthday gift. *See McCauley*, 101 Ariz. at 14 (determining that action was "hasty" where decedent called an attorney "from the hospital shortly before the will was signed and asked him to draw a will" and "[t]he execution was accomplished . . . in approximately ten minutes" at the hospital).

(3) <u>Was the execution of the 2017 deed concealed from others?</u> Rosenberg claims that Brandt's family did not know about the 2017 deed. But the 2017 deed was a public record, Brandt did not traditionally discuss his financial affairs with Rosenberg, she did not ask Brandt what he had done with

the deed, and Rosenberg did not demonstrate that his silence with relatives on such a financial matter was unusual.

(4) <u>Was Sanders active in securing the drafting and execution of the 2017 deed</u>?  Rosenberg did not present evidence that Sanders was active in the drafting or execution of the 2017 deed, and as discussed, any inferences she offers do not create a genuine dispute as to any material fact.  Section C, ¶¶ 45-50.

(5) <u>Was the 2017 deed as drawn consistent or inconsistent with prior declarations and plannings of Brandt</u>?  The 2017 deed was consistent with Brandt's practice of leaving his properties to female companions.  Rosenberg did not present evidence that the 2017 deed as drawn was inconsistent with Brandt's prior declarations or plannings.

(6) <u>Was the 2017 deed unnatural in view of Brandt's circumstances, attitudes, and family</u>?  The 2017 deed was reasonable in view of Brandt's circumstances, attitudes, and values.  The 2017 deed continued Brandt's practice of granting an interest in his properties to female companions when he had such companions in his life.

*See generally McCauley*, 101 Ariz. at 10–11, 13–16 (discussing the evidence presented).

**¶40**        As to the seventh *McCauley* factor, we acknowledge that the parties presented conflicting evidence about Brandt's susceptibility to undue influence when he executed the 2017 deed.   This evidence includes medical records.   In addition, Rosenberg presented an expert opinion that Brandt was susceptible to undue influence in April 2017, although Sanders presented an expert opinion that Brandt was not susceptible to undue influence at that time.

**¶41**        As to the eighth *McCauley* factor, the parties agree that Sanders and Brandt were in a confidential relationship.   Rosenberg has established this factor.

¶42          The focus here, as with all claims of undue influence, is whether Sanders "through [her] power over the mind of [Brandt] ma[de] the latter's desires conform to [Sanders'] own, thereby overmastering the volition of [Brandt]."  *See id.* at 10.   Although none of the *McCauley* "factors standing alone or even in combination with some others, may be sufficient to sustain a finding of undue influence, the force of the combination of all these factors may be sufficient to raise a question of fact as to the existence of undue influence."  *Id.* at 11.

¶43          We recognize that undue influence may be established by circumstantial evidence.  *Id.* at 10.   However, to establish an undue influence claim, "[m]ore must be proved than mere opportunity and motive."  *In re Silva's Estate*, 105 Ariz. 243, 246 (1969).   On this point, our case law provides guidance.   In one case, this Court determined that an alleged influencer's (1) confidential relationship with decedent, (2) activity in preparing the wills, and (3) status as principal beneficiary were insufficient to sustain a finding of undue influence.  *In re Pitt's Estate*, 88 Ariz. 312, 316–18 (1960).   In another case, this Court held the "fact that [the beneficiary] had the opportunity to exercise such influence over deceased is not sufficient to establish undue influence and to invalidate a will."  *In re O'Connor's Estate*, 74 Ariz. at 260.

¶44          Here, Rosenberg's evidence of susceptibility and the existence of a close relationship under the seventh and eighth *McCauley* factors are insufficient to defeat summary judgment.  *See In re Estate of Sidransky*, 420 S.W.3d 90, 98 (Tex. App. 2012) ("Even in light of [a medical expert's] affidavit, Sidransky's weakened physical and mental condition only indicates her *susceptibility* to influence; it is no evidence that such influence *existed* in fact."); *Matter of Estate of Brosius*, 683 P.2d 663, 666 (Wyo. 1984) (concluding that evidence of susceptibility and opportunity and status as beneficiary "is wholly immaterial . . . unless it can be tied to evidence that [appellee] actually exerted control over the testator so as to make the 1976 instrument her will rather than his"); *Golladay v. Golladay*, 287 S.W.2d 904, 906 (Ky. 1955) ("Mere opportunity of the wife, even though coupled, as here, with an aged and physically weak condition of the testator, is not sufficient to establish undue influence.").   Rosenberg's evidence does not amount to "evidence from which a reasonable person could conclude that [Sanders] had a disposition to exercise such influence, that [she] had an opportunity to exercise undue influence, that some influence was exerted,

and that the [2017 deed] seems to result from such influence." *See McCauley*, 101 Ariz. at 11.

¶45 Rosenberg claims that summary judgment is improper because Brandt's alleged post-execution statements are "inconsistent" with Sanders' story (noting *McCauley*'s fifth factor) and thereby raise "inferences" of undue influence that the trier of fact must resolve. For example, Rosenberg argues that Brandt's failure to mention the 2017 deed to Rosenberg or Susan, in combination with his alleged post-execution statements, raises an inference that Brandt did not voluntarily sign the deed.

¶46 Further, Rosenberg contends that Brandt "was in no condition" to drive after his hospital discharge on March 11, 2017, noting the medical issues documented in his discharge summary. Therefore, Rosenberg claims that his post-execution statements raise an inference that Sanders drove Brandt to sign and record the deed in April 2017, and this is inconsistent with her claim that she did not know about the 2017 deed until two months after its execution.

¶47 As to the claimed inconsistencies, we note that *McCauley*'s fifth factor addresses "whether the will as drawn was consistent or inconsistent with prior declarations and plannings" of the testator. 101 Ariz. at 11. In *McCauley*, the "pattern of distribution" in the will was "entirely inconsistent with decedent's oft-repeated purpose to exclude husbands—including proponent—from sharing in her property." *Id.* at 15. But here, the 2017 deed was not inconsistent with Brandt's alleged statements in the hospital. None of the alleged declarations addressed his state of mind, his mental condition, or the circumstances present at the time of the execution of the 2017 deed fourteen months earlier, nor did they reference how he planned to distribute the Properties.

¶48 Moreover, Sanders' claims do not raise inferences of undue influence that create a genuine dispute as to any material fact. First, the evidence shows that Brandt did not discuss his financial affairs with Rosenberg (except when he named her on the 2005 deed), and Rosenberg did not produce evidence that she asked Brandt what he had done with the deed or that his silence with relatives on such a financial matter was unusual.

¶49 Second, Sanders testified that Brandt drove himself to get the 2017 deed signed and notarized on April 6, 2017. Although Rosenberg generally claimed that Brandt "was in no condition" to drive after his hospital discharge on March 11, 2017, Brandt signed the 2017 deed nearly one month after his discharge. In addition, Rosenberg did not visit or personally observe Brandt in March or April 2017; she did not visit Brandt until October 2017. Further, Rosenberg acknowledged that Brandt was driving himself very short distances in early 2017.

¶50 Third, as discussed, Brandt's alleged post-execution statements only speak to his state of mind and mental condition in June 2018 and are unrelated to the circumstances present when he signed the 2017 deed, making his statements irrelevant to the claim here. As stated in *In re Harber's Estate*, "[i]n the absence of sufficient evidence upon which reasonable [persons] could draw an inference that undue influence had been exerted . . . and that the will was a product of that influence the case should not go to a jury. Mere suspicion, innuendo, insinuation and speculation are no substitute for evidence." 102 Ariz. at 294. Rosenberg's inferences do not create a genuine dispute of material fact concerning whether Sanders exerted undue influence at the time of execution, or whether the 2017 deed was the product of Sanders' undue influence.

¶51 Finally, in arguing that summary judgment was improper, Rosenberg points to one additional alleged post-execution statement after Brandt was discharged from the hospital in June 2018. Rosenberg's declaration asserts that when Susan stayed in Arizona to help care for Brandt, "Susan asked Alex whether he had given his home to [Sanders]. He flatly denied that he had done that." Rosenberg claims that this statement demonstrates that Brandt "never intended to give his properties to Marilyn, by way of beneficiary deed or otherwise."

¶52 As an initial matter, Rosenberg does not claim that she personally overheard this conversation between Susan and Brandt, nor did she produce testimony or a declaration directly from Susan concerning this alleged statement. *See* Ariz. R. Civ. P. 56(c)(5) ("An affidavit used to support or oppose a motion must be made on personal knowledge [and] set out facts that would be admissible in evidence."). But even so, this alleged

statement is insufficient to defeat summary judgment. At most, it bears upon Brandt's state of mind after he was discharged from the hospital in June 2018 that he had not "given his home" to Sanders. And in fact, Brandt was the current owner of his home at that time. *See* A.R.S. § 33-405(A) ("A deed that conveys an interest in real property . . . to a grantee beneficiary designated by the owner and that expressly states that the deed is effective on the death of the owner transfers the interest to the designated grantee beneficiary effective on the death of the owner . . . ."); A.R.S. § 33-405(M)(1)–(2). The alleged statement does not create a genuine dispute of material fact that Sanders through her power over the mind of Brandt made his desires conform to her own, thereby overmastering the volition of Brandt. *See McCauley*, 101 Ariz. at 10; *see also In re Silva's Estate*, 105 Ariz. at 246 ("When a decedent leaves a large estate to a stranger, ignoring close ties of blood, there are situations in which it may be inferred that the will was the result of undue influence. Here, such is not the case.").

**CONCLUSION**

¶**53** For the foregoing reasons, we vacate the court of appeals' opinion although we approve much of its reasoning as to the eight *McCauley* factors. We affirm the trial court's grant of summary judgment in favor of Sanders.